NAGEL RICE, LLP
Bruce H. Nagel, Esq.
bnagel@nagelrice.com
Greg M. Kohn, Esq.
gkohn@nagelrice.com
103 Eisenhower Parkway
Roseland, NJ  07068
973-618-0400
Attorneys for *Plaintiffs and Putative Class*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| STEVEN GLICKMAN, and ANDREW KIMMEL, on behalf of themselves and the Putative class, | : : : : : |
|  | : Civil Action No.: 15:cv:08041 |
| Plaintiffs, | : |
|  | : |
| vs. | : |
|  | : |
| LIVE NATION ENTERTAINMENT, INC., LIVE NATION WORLDWIDE, INC., LIVE NATION CONCERTS, LIVE NATION TICKETING LLC, LIVE NATION GLOBAL TOURING, ABC CORP. 1-20, | : : : : : : |
|  | : |
| Defendants. | : |

## FIRST AMENDED COMPLAINT AND JURY DEMAND
### (CLASS ACTION)

Plaintiff, Steven Glickman, residing in Livingston, New Jersey, and Plaintiff, Andrew Kimmel, residing in Edgewater, New Jersey, by and through their undersigned attorneys, by way of First Amended Complaint, brings this suit against Defendants Live Nation Entertainment, Inc. ("LNE"), Live Nation Worldwide, Inc. ("LNW"), Live Nation Concerts ("LNC"), Live Nation Ticketing, LLC ("LNT"), Live Nation Global Touring ("LNGT"), and ABC Corp. 1-20 (LNE, LNW,

LNC, LNT, LNGT, and ABC Corp 1-20 collectively the "Defendants") to recover damages owed to them and others similarly situated.

## I. <u>NATURE OF THE ACTION</u>

1.    Defendants promoted, sold tickets to, and were responsible for ticket allocation and distribution for many concerts held in New Jersey for the six year period prior to the filing of the complaint in this matter (collectively the "Concerts"). Defendants actions are ongoing.

2.    Defendants promoted, sold tickets to, and were responsible for ticket allocation and distribution for Phish's 2013 Fall Tour held at Boardwalk Hall and Maroon 5's "Overexposed" tour held at the IZOD Center.

3.    It is a violation of the New Jersey Consumer Fraud Act, <u>N.J.S.A.</u> 56:8-1 *et*. *seq.* (the "Statute") for Defendants to withhold more than 5% of all available seats to a concert from sale to the general public.  Stated another way, Defendants must make 95% of tickets for a concert available for sale to the general public.

4.    There exists within the entertainment and sports industries a customary practice of withholding a percentage of tickets from public sale either through contractual obligations or by way of habit and custom. Commonly known as "holds" or "hold-backs", these tickets are held for persons and groups such as event promoters, sponsors, performers, entertainment critics, celebrities, local dignitaries, and other connected insiders.

5.    Defendants held back tickets for all of the Concerts at issue.

6.    Some of these holds are then sold to ticket brokers, ticketing companies, venues, or artists for resale on the secondary market.  This allows those entities to obtain large blocks of prime tickets for the Concerts prior to those tickets being offered to the public.   These brokers, venues, artists, and ticketing companies, or others pay Defendants a premium in order to have access to the best seats to the Concerts before the general public.

7.    Those    prime    seats    are    then    sold    through primary/secondary   channels   as   VIP   Packages,   Official   Platinum Seats,   Ticketsnow,   TM+,   or   other   marketplaces   for   the   highest market value. Defendants are providing/selling the best tickets to venues, artists, and ticketing companies who are then selling those tickets to the general public for more than face value.

8.    The effect of Defendants' withholding of tickets from sale to the public limits the available seats that the general public can purchase at face value, which increases demand for tickets on the secondary market causing prices to increase.   See Declaration of Daniel Rascher, PH.D. ("Rascher Decl.") attached hereto as Exhibit A.

9.    Defendants actions and their withholding of more than 5% of tickets for the Concerts from sale to the general public, forced fans into a secondary market for tickets to the Concerts where

they paid substantially more than the ticket's face value.  See Rascher Decl. at ¶¶22-24.

10.  In addition, Defendants have a custom and practice of withholding tickets to the Concerts.  Defendants withheld tickets to every identifiable Live Nation concert held at Boardwalk Hall since 2008.

11.  In accordance with Defendants long standing custom and practice, Defendants also withheld tickets to Live Nation concerts held at the IZOD Center, Prudential Center, Metlife Stadium, Giants Stadium, and other New Jersey venues.

12.  Defendants withheld more than 5% of all available tickets to the following **24** concerts at Boardwalk Hall: Jimmy Buffet 2008, Jimmy Buffet 2009, Jimmy Buffet 2012, Aerosmith 2014, Aerosmith 2010, Beyonce 2013, Britney Spears 2011, Elton John 2008, Jason Aldean 2014, Jay-Z & Kanye West 2011, Kanye West 2014, Kiss & Def Leppard 2014, Lady Gaga 2011, Lady Gaga 2010, Lady Gaga 2014, Luke Bryan 2013, Madonna 2008, Madonna 2012, Mary J Blige & Jay-Z 2008, Miranda Lambert & Dierks Bentley 2013, Nickelback 2010, Phish 2010, Phish 2013, and Rascal Flatts 2012.

13.  Aerosmith held two shows at Boardwalk Hall, one in 2010 and one in 2014.  In 2014, the director of ticketing for Live Nation National Touring sent an e-mail to numerous venues that were hosting Aerosmith concerts setting forth the ticketing instructions for the concert.  The e-mail stated "There are a lot

of holds with very specific request."   A copy of the e-mail is set

forth below:

**From:** Jen Zahorchak [mailto:JenZahorchak@LiveNation.com]
**Sent:** Thursday, April 03, 2014 9:02 PM
**To:** Josh Iden; Emma Pancoast; Paul Macdonald; Kathryn Deamaral; Kelly Benhase; Daniel Mollway; Amanda Kopec; So Cal Ticketing; Valenzuela, John; lilia.zepeda@msg.com; Flores, Janet; Frank, Yvette; Fujii, Megumi; Jozee Perrelli; Andrea Bradley; Deb Murdock; Rochelle (Scott) Henningfield; april.killian@pepsicenter.com; Buck Williams; 'Caroline Zalman'; David H Wallace; Xavier Alvarado; Tara Bryant; Williams, Sam; Tommy Nash; Harris, Bill; Jeffrey Weinhold; Redlowsk, Bridgette; Ronald Clause; Dave Clark
**Cc:** Rinat Radvinsky; Carrie Paglinco; Ryan McElrath; Courtney Caswell; Chase Rosencrantz
**Subject:** Aerosmith 2014 - Ticketing Letter + Timeline

Hello –

Attached please find the ticketing letter and timeline for Aerosmith: Let Rock Rule.

Once your event build is complete, please send me the following starting reports: starting audit, maptype of each hold, and a scaling map. Non-TM events please also send a ticket header and event link.

A few key notes:
- Announce time is TBD
- VIP Package Pricing for Aerosmith Packages is TBD
- Facebook Presale password is TBD
- There are a lot of holds with very specific requests. Please do your best to meet the hold requirements, and reach out to me if you get stuck. If you had a show in 2012, please try to carve out a similar hold scenario (I've included Deidra's 2012 suggestions for a good reference).
- Markets with American Express offers – to calculate the breakdown for AMEX, please take remaining opens after holds – 10% goes to public hold, and 1,000 tickets should be left in OPEN for Fan Club & other presales. After this, the remaining inventory will be your AMEX allotment. Please follow percentage breakdowns in the letter to carve out to specific card types.
- Some markets will have a Groupon offer at the onsale – Chase will be in touch regarding offer setup.

Please remember to place your credit card post sale inventory as well.
Thank you!

Jen Zahorchak | Director - Ticketing | National Touring
Email: jenskatba@livenation.com
Phone: (310) 867-7107 Cell: (310) 691-9008 Fax: (310) 861-5284
9348 Civic Center Drive, Beverly Hills, CA 90210
www.LiveNation.com

   

14.   Defendants withholding of tickets was not based on the

venue hosting the Aerosmith concerts, but were global instructions

for all Aerosmith concerts, including the concerts in New Jersey.

15.   At least 2,030 tickets were withheld by Defendants for

the Aerosmith concert in 2014.   Only 10% of all open tickets after

holds   were   set   aside   for   sale   to   the   public.     Defendants

5

withholding of more than 5% of all available tickets violates the Statute.  A copy of the hold document is set forth below:

| AEROSMITH HOLDS | | | | | | | |
|---|---|---|---|---|---|---|---|
| NUMBER | NAME | NOTES | P1 | P2 | P3 | P4 | DETAILS |
| OPEN | VIP1HOLD | (50) 1ST 10 | 50 | | | | SPLIT W/PLAT |
| F-HOLD | PLAT | 1ST 10 ROWS | 300 | | | | 1ST 15 FLOOR, 1ST 5 SIDE |
| 1-BAND | BAND#ST | 20 FR | 120 | | | | 100 1ST 10 |
| 1-BAND | BAND#JP | 20 FR STAGE LEFT | 120 | | | | 100 1ST 10 |
| 1-BAND | BAND#JK | 20 1ST 5 BY THRUST | 20 | | | | |
| 1-BAND | BAND#BW | 20 1ST 5 STAGE RIGHT | 20 | | | | |
| 1-BAND | BAND#TH | 20 1ST 15 STAGE RIGHT | 20 | | | | |
| 2-HOLD | HK | ROWS 5-10 BOWL | 10 | | | | 1ST SECTION DOWNSTAGE EDGE |
| 1-BAND | SUPPC | 10 1ST 20 ROWS | 20 | 20 | | | 10 P1 STG LEFT MAX ROW 15 |
| 1-BAND | SUPPB | | 100 | | | | LOW BOWL SIDE STG LEFT |
| 1-BAND | BAND#BUY | | 20 | | | | |
| 2-LNT | LNT | 20 FLOOR ROWS 10-14 | 50 | 10 | | | 30 P1 LOWER CLOSEST TO STAGE |
| OPEN | VIP4HOLD | | 50 | | | | B/A AFTER OTHER HOLDS |
| OPEN | VIP2HOLD | | 1000 | | | | B/A AFTER OTHER HOLDS |
| OPEN | VIP3HOLD | | 100 | | | | B/A AFTER OTHER HOLDS |
| 4- | MKTG | | | | | | |
| 8-HOLD | BUILD | NOTHING IN 1ST 10 | | | | | |
| HOLD | PUBLIC | | | | | | 10% OF OPENS AFTER HOLDS |
| OPEN | AMXCNT | | | | | | 7% P1 |
| OPEN | AMXPLT | | | | | | 20% P1 |
| OPEN | AMXGLD | | | | | | 73% P1/P2 |
| OPEN | AMXBLU | | | | | | 80% |
| | | | | | | | |
| POST SALES | | | | | | | |
| OPEN | AMXGLDHOLD | | 100 | | | | |
| OPEN | AMXBLUHOLD | | | | | | 400 TICKETS |
| OPEN | CITIPOSTHOLD | | 200 | 200 | | | |

16.  For Aerosmith's 2010 concert, Live Nation circulated a chart of venues hosting the concert along with a chart setting forth what tickets to withhold.  Defendants withheld at least 1,292 tickets to the 2010 concert. The withholding of tickets to this concert was in excess of 5% of all available tickets and a violation of the Statute. A copy of the chart is set forth below:



17.  Prior to Luke Bryan's concert in 2014, a Tour Ticketing Letter was circulated by Defendants to the venues hosting the concerts showing the amount of tickets that needed to be withheld for **each concert** regardless of the venue. At least 384 tickets were withheld by Defendants. The withholding of tickets to this concert was in excess of 5% of all available tickets and a violation of the Statute. A copy of the letter is set forth below:

## TICKET HOLDS

### LUKE BRYAN
- One Hundred Twenty (120) COMP tickets
  - 20 GA
  - 40 within rows 5-10 on the floor
  - 60 lower bowl within first four rows of third section from stage (on left or right side of house)
- Forty (40) COD tickets held for potential label purchase

### VIP TICKET PACKAGES
- Three Hundred (300) P1 tickets within rows 1-10 of the lower bowl in second section from stage on left and right side of house. (150 second section stage right and 150 second section stage left)
- CID Entertainment is handling our VIP Packages. Please send approved holds to David Sher davidsher@cidentertainment.com and Mike Strauss mikestrauss@cidentertainment.com (267.528.0400) per CID's ticketing letter.
- VIP tickets should be available during ALL presales, as well as the public on sale.
- VIP tickets go on sale via Ticketmaster starting Tuesday prior to on sale at 10am local time (so they are available during Luke's fan club presale) and stay enabled for ALL presales.
- VIP ticket limits: 4 tickets pre-sale. 6 tickets public on sale
- **Please hold back 30 VIP tickets for the public on sale.**

### TOUR SPONSORS
**1) CABELA'S**
- 10 P1 tickets for potential purchase lower bowl
- 20 tickets in rows 6-8 on the floor

**2) Miller Lite – TBD**

**3) Potential Sponsors**
- 24 P1 tickets – all tickets together and in rows 6-10 on floor
- 20 P1 tickets for potential purchase lower bowl

**4) GAC**
- 10 GA tickets. These tickets are to remain on hold. A will call list will be provided day of show.

**5) CITI**
- Citi Preferred - 100 P1 reserved tickets to be sold as Citi Preferred
- Citi Preferred may be released for public sale after all other inventory is sold out in each price level or 4 weeks prior to show date, which ever occurs first

### RED LIGHT MANAGEMENT –
- Thirty (30) P1 tickets for potential purchase within rows 6-10 lower bowl in second section from stage

## SUPPORT
### SUPPORT #1 – Lee Brice
- Forty (40) COMP tickets
- Thirty (30) COD tickets held for potential label purchase

### SUPPORT #2 – Cole Swindell
- Twenty (20) COMP tickets
- Twenty (20) COD tickets for potential label purchase

18.   Lady Gaga held concerts at Boardwalk Hall in 2010, 2011, and 2014.   Again, Defendants withholding was not limited to just this venue or just this artist.   The amount of tickets withheld were approximately 2,918 for the 2010 concert and 3,332 in 2011. The ticketing instructions for Lady Gaga's 2010 tour are for **all North America Arenas** as set forth below.

**Lady Gaga**
**Monster Ball Tour 2010**

Hold Info

Print Date: 10/22/2015
Print Time:  10:23 AM

**CITY: ATLANTIC CITY**          **VENUE:**          **Boardwalk Hall**

**DATE:**    **Sun Jul 4/10**

| TICKET HOLDS PAY FORS: | P1 | P2 Flr GA | P2 Res | P3 | TOTAL | Hold Code | Location Notes |
|---|---|---|---|---|---|---|---|
| | | | | | | | Hold groups of 4 or 6 or 8, no block hold. Hold 60% on stage left, 40% stage right, in lower third of section starting in 4th row at the main stage, and going to the b-stage or |
| Lady Gaga | 70 | 30 | | | 100 | 1#gagahold | 1 section past b-stage if necessary. |
| Support | | 10 | 10 | | 20 | 1#supphold | best P2's |
| Crew | 40 | | | | 40 | 1#crewhold | good seats near artist holds but behind artist holds |
| Artist Sponsors | 50 | | | | 50 | 1#sponhold | include some artist quality holds, the rest good |
| LNGT | 40 | 40 | 10 | | 90 | 2#lngthold | same as artist holds |
| WME | 30 | | | | 30 | 2#wmehold | include some artist quality holds, the rest very good |
| Virgin Mobile | 20 | 20 | | | 40 | 2#vmobhold | half in row 3 and half in row 6 within first 2 sections on either side of stage |
| Label (IGA) | 6 | | 48 | 6 | 60 | 2#igahold | some must be great, with the rest within the best 50% of price level |
| Label Promo | | | | 40 | 40 | 2#labpromhold | best of the price level |
| Venue | 42 | 30 | | 62 | 134 | 8 | no floors |
| Local Promoter | 50 | | 50 | | 100 | 5 | some decent seats |
| LN Exec/Alliance | 2 | | | | 2 | 2#lnexechold | some decent seats |
| Pool | 200 | | 200 | 100 | 500 | | Must be in groups of 6 or 8 scattered throughout best 50% of price level. |
| Caesars | 910 | | 160 | | 1,070 | 7#caesarshold | great seats |
| Taj | 300 | | 16 | | 316 | 7#trumphold | great seats |
| Borgata | 150 | | 250 | | 400 | 7#borgatahold | 150 to be great |
| PRESALES: | | | | | | | |
| Citi presale | | | | | | | all opens after holds & public holdback but must have some great seats |
| Citi preferred | 100 | | 100 | | 200 | | hold the best 400 remaining Citi opens after Citi presale ends, prefer P1/P2 |
| Virgin Mobile | | | | | | | must be within best 40% of price level and must include some great seats |
| Venue Presale | | | | | | | n/a |
| VIP Packages | | | | | | | P1=must be great seats starting at main stage and going no more than 1 section past b-stage, in low rows.  Close to party room if possible. P2=must be best of price level, lower bowl if available (not side stage though) |
| Public Holdback | | | | | | | Hold a mix of seats, front to back. |
| COMPS: | | | | | | | |
| Sprint | 8 | | | | 8 | 4#sprinthold | within best 50% of price level |
| Radio Promo | 20 | 60 | 40 | 80 | 200 | 4#radiohold | decent to mid-grade |
| Reviewer | 20 | | | | 20 | 4#reviewhold | hold on stage left, directly in front of b-stage between rows 8-10, on aisle |
| Virgin Mobile | 10 | | | | 10 | 4#vmobchold | half in row 3 and half in row 6 within first 2 sections on either side of stage |
| TOTAL | 2,068 | 190 | 884 | 288 | 3,430 | | |

**THE HOLDS ARE TO BE MANAGED AS FOLLOWS**
No seats may be held in the first 6 rows of the stands unless authorized by Live Nation Global Touring (LNGT).
Orders may be processed once LNGT have approved the final manifest, starting the day after public onsale.
ALL SEATS HELD ARE CONSIDERED SOLD.  THERE ARE NO RETURN PRIVILEGES.
All payments are to be made to the ticket agent or the Venue, not LNGT or the local promoter.
No tickets are to be released without full payment, no consignments, no credit
and no paying at settlement.
No comps unless authorized by LNGT.
Assign only even amounts per row, no odd numbers unless asked for.

Copy of LGG2010-3sheet-AtlanticCity 3.26.10 Hold Info

Live Nation Global Touring
Toronto, CANADA

**CITY: ATLANTIC CITY**          **VENUE:**          **Boardwalk Hall**

**DATE:**    Sat Feb 19/11

| TICKET HOLDS PAY FORS: | P1 | P2 Flr GA | P2 Res | P3 | TOTAL | Hold Code | Location Notes |
|---|---|---|---|---|---|---|---|
| | | | | | | | Hold groups of 4 or 6 or 8, no block hold. Hold 60% on stage left, 40% stage right, in lower third of section starting in 4th row at |
| Lady Gaga | 70 | 30 | | | 100 | 1#gagahold | the main stage, and going to the b-stage or 1 section past b-stage if necessary. |
| Support | | 10 | 10 | | 20 | 1#supphold | best P2's |
| Crew | 40 | | | | 40 | 1#crewhold | good seats near artist holds but behind artist holds |
| Artist Sponsors | 30 | | | | 30 | 1#sponhold | include some artist quality holds, the rest good |
| LNGT | 40 | 40 | | | 80 | 2#lngthold | same as artist holds |
| WME | 20 | | | | 20 | 2#wmehold | include some artist quality holds, the rest very good |
| Virgin Mobile | | | | | | 2#vmobhold | half in row 3 and half in row 6 within first 2 sections on either side of stage |
| Label (IGA) | 40 | | 40 | 20 | 100 | 2#igahold | some must be great, with the rest within the best 50% of price level |
| Label Promo | | | 54 | 50 | 104 | 2#labpromhold | best of the price level |
| Venue | 80 | 40 | 20 | 80 | 220 | 8 hall | no floors |
| Local Promoter | 50 | | 50 | | 100 | 6 lnlo | some decent seats |
| LN Exec/Alliance | | | | | | 2#lnexechold | some decent seats |
| Pool | 200 | | 200 | 100 | 500 | 5 pool | Must be in groups of 6 or 8 scattered throughout best 50% of price level. |
| Caesars | 1,310 | | 60 | | 1,370 | 7#caesarshold | great seats |
| Taj | 146 | | 114 | | 260 | 7#trumphold | great seats |
| Borgata | 150 | | | | 150 | 7#borgatahold | 150 to be great |
| PRESALES: | | | | | | | |
| Citi presale | | | | | | | all opens after holds & public holdback but must have some great seats |
| Citi preferred | 200 | | 200 | | 400 | | hold the best 400 remaining Citi opens after Citi presale ends, prefer P1/P2 |
| Virgin Mobile | | | | | | | must be within best 40% of price level and must include some great seats |
| Venue Presale | | | | | | | n/a |
| VIP Packages | | | | | | | P1=must be great seats starting at main stage and going no more than 1 section past b-stage, in low rows.  Close to party room if possible. P2=must be best of price level, lower bowl if available (not side stage though) |
| Public Holdback | | | | | | | Hold a mix of seats, front to back. |
| COMPS: | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| Sprint | 8 | | | | 8 | 4#sprinthold | within best 50% of price level |
| Radio Promo | 20 | 60 | 40 | 80 | 200 | 4#radiohold | decent to mid-grade |
| Reviewer | 20 | | | | 20 | 4#reviewhold | hold on stage left, directly in front of b-stage between rows 8-10, on aisle |
| Virgin Mobile | | | | | | 4#vmobhold | half in row 3 and half in row 6 within first 2 sections on either side of stage |
| | | | | | | | |
| | | | | | | | |
| TOTAL | 2,424 | 180 | 788 | 330 | 3,722 | | |

**THE HOLDS ARE TO BE MANAGED AS FOLLOWS**
No seats may be held in the first 6 rows of the stands unless authorized by Live Nation Global Touring (LNGT).
Orders may be processed once LNGT have approved the final manifest, starting the day after public onsale.
ALL SEATS HELD ARE CONSIDERED SOLD.  THERE ARE NO RETURN PRIVILEGES.
All payments are to be made to the ticket agent or the Venue, not LNGT or the local promoter.
No tickets are to be released without full payment, no consignments, no credit
and no paying at settlement.
No comps unless authorized by LNGT.
Assign only even amounts per row, no odd numbers unless asked for.

Copy of LGG2011-3sheet-AtlanticCity Hold Info

Live Nation Global Touring
Toronto, CANADA

    19.  The withholding of tickets to the Lady Gaga concerts in

New Jersey was in excess of 5% of all available tickets and a

violation of the Statute.

20.   In July 2013, Live Nation presented a concert by Beyonce at the Boardwalk Hall in Atlantic City, New Jersey.   Boardwalk Hall had a seating capacity of 12,962 for the concert.   Live Nation withheld over 2,000 tickets for the artist, label, sponsors, casinos, venue, local promoters and itself as set forth in the chart below. This included the majority of the best seats in the house.

**BEYONCE**
Starring in The Mrs. Smith Show

Hold Info

Print Date: 10/22/2015
Print Time:  11:50 AM

CITY: **ATLANTIC CITY**      VENUE:      **Boardwalk Hall**

DATE:   **Fri Jul 26/13**

** NO SIDE STAGE HOLDS FOR ANY HOLDS OR PRESALES **

| TICKET HOLDS PAY FORS: | P1 | P2 | P3 | P4 GA | P5 | P6 | TOTAL | Hold Code | Location Notes |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | P1=Hold groups of 6 to 10, no block hold. Hold on aisle when possible, in lower third of first section on either side of stage starting in 4th row.  Do not hold on DSE side, so as to get a fuller view of stage.  If required go into 2nd section from stage as well.  Split 50/50 between stage left/right. P2=same rules as above, in best P2 sections in lower bowl (but not side stage). |
| Artist/Mgmt | 50 | 50 | 10 | 110 | | | 220 | 1#art | |
| LN Global Touring | 18 | 10 | | 10 | | | 38 | 2#lngt | same quality as artist holds |
| Label (Sony) | 6 | 40 | 10 | 16 | | | 72 | 2#sony | Must have some great seats that are same quality as artist hold.  Otherwise hold good seats. |
| Sponsor: Pepsi | 12 | 20 | 8 | 10 | | | 50 | 2#pepsi | Same instructions as above. |
| H&M | | | | | | | | | none |
| Coty | | | | | | | | | none |
| Support/SuppLabel | | 10 | | 10 | | | 20 | 1#supp | good seats |
| Local Promoter | 50 | 140 | | | | | 190 | 3 | include some great seats |
| Venue | 70 | 50 | 84 | 50 | | 44 | 298 | 8 | |
| Casino Buys | 760 | 290 | 10 | | | | 1,060 | 5/7 | |
| LN Alliance | | | | | | | | 2#lnall | include some great seats |
| PSS Red Card | | | | | | | | | if approved |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| public | | | | | | | | H | In each price level, hold 50 to 100 decent scattered seats.  For the balance at each price level, **hold the very worst solid blocks of seats! Solid blocks!! Very worst!!** |
| | | | | | | | | | |
| **PRESALES:** | | | | | | | | | |
| | | | | | | | | | P1/P2=starting in best sections hold every 3rd row holding full rows if possible.  For the balance hold the best sections, again holding full rows where possible. |
| Fan Club/VIP Pkgs | | | | | | | | f | |
| Mastercard | | | | | | | | | all opens after holds and public |
| Venue | | | | | | | | | will sell from unsold mastercard inventory |
| | | | | | | | | | |
| | | | | | | | | | |
| **COMPS:** | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| Marketing Promo | 20 | 40 | 30 | 30 | | | 120 | 4#promo | mid-grade  (not the very best or worst) |
| Reviewer | | | | | | | 20 | 4#review | in 2nd section from stage on aisle in groups of 4 or 6, between 8-12 rows up |
| | | | | | | | | | |
| **TOTAL** | 1,006 | 650 | 152 | 236 | | 44 | 2,088 | | |

**THE HOLDS ARE TO BE MANAGED AS FOLLOWS**
Orders may be processed once LNGT have approved the final manifest, starting the day after public onsale..
ALL SEATS HELD ARE CONSIDERED SOLD.  THERE ARE NO RETURN PRIVILEGES.
All payments are to be made to the ticket agent or the Venue, not LNGT or the local promoter.
No tickets are to be released without full payment, no consignments, no credit
and no paying at settlement.
No comps unless authorized by LNGT.
Assign only even amounts per row, no odd numbers unless asked for.

BEYONCE2013-3sheet-AtlanticCity Hold Info

**Live Nation Global Touring**
Toronto, CANADA

21. Defendants' withholding was more than 5% of all available seats to the Beyonce concert and a violation of the Statute.

22. Further, Live Nation admitted in its Ticketing Information instructions for Beyonce's 2013 tour that "The ticket inventory for this show will be strictly controlled by Live Nation Global Touring who has final say over all holds and releases including those from the venue and from local Live Nation offices." (emphasis in original).

23. Jimmy Buffet held concerts at Boardwalk Hall in 2008, 2009, and 2012. For each concert, Defendants withheld numerous tickets. Over 5,000 tickets were withheld for the concert in 2008, over 2,800 tickets withheld in 2009, and over 2,000 tickets withheld in 2012 as set forth in the charts below.

| | | | | | JIMMY BUFFETT | |
|---|---|---|---|---|---|---|
| | | | | | AND THE CORAL REEFER BAND | |
| | | | | | BOARDWALK HALL | |
| | | | | | ATLANTIC CITY, NJ | |
| | | | | | SUN AUG 24TH 2008 8:00PM | |
| | | | | | | |
| | | | | | TOTAL | |
| | $226.00 | $156.00 | $96.00 | $66.00 | CAPACITY | |
| CAPACITY: | 4983 | 5418 | 3051 | 1936 | 15388 | SEATING CAP |
| LESS KILLS: | 0 | 1516 | 0 | 0 | 1516 | === |
| SELLABLE CAPACITY: | 4983 | 3902 | 3051 | 1936 | 13872 | NET CAP |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| CAESARS (SPONSOR) | 490 | 570 | 10 | 0 | 1070 | E-HOLD |
| BAND | 306 | 48 | 0 | 0 | 354 | 1-HOLD |
| LANDSHARK | 100 | 0 | 0 | 0 | 100 | 2-HOLD |
| MARGARITAVILLE | 28 | 0 | 0 | 0 | 28 | 3-HOLD |
| PARROTHEAD | 0 | 0 | 0 | 285 | 285 | 4-HOLD |
| LIVE NATION | 90 | 100 | 0 | 0 | 190 | 5-HOLD |
| RADIO PROMOTION | 0 | 0 | 18 | 0 | 18 | 6-HOLD |
| ISL | 50 | 140 | 142 | 0 | 332 | 7-HOLD |
| BUILDING | 99 | 94 | 102 | 140 | 435 | 8-HOLD |
| ADA | 60 | 60 | 60 | 16 | 196 | 9-HOLD |
| | | | | | | |
| | | | | | | |
| TOTAL HOLDS: | 1223 | 1012 | 332 | 441 | 3008 | |
| | | | | | | |
| | | | | | | |
| AVAILABLE TO PURCHASE: | 3760 | 2890 | 2719 | 1495 | 10864 | |

AND THE CORAL REEFER BAND

BOARDWALK HALL

ATLANTIC CITY, NJ

SUN AUG 24TH 2008 8:00PM

| | $226.00 | $156.00 | $96.00 | $66.00 | TOTAL CAPACITY | |
|---|---|---|---|---|---|---|
| CAPACITY: | 6368 | 4874 | 2226 | 1510 | | 14978 SEATING CAP |
| LESS KILLS: | 0 | 144 | 0 | 0 | | 144 === |
| SELLABLE CAPACITY: | 6368 | 4730 | 2226 | 1510 | | 14834 NET CAP |
| | | | | | | |
| | | | | | | |
| CAESARS (SPONSOR) | 1150 | 1050 | 550 | 0 | | 2750 E-HOLD |
| BAND | 494 | 132 | 0 | 0 | | 626 1-HOLD |
| LANDSHARK | 150 | 0 | 0 | 0 | | 150 2-HOLD |
| MARGARITAVILLE | 34 | 0 | 0 | 0 | | 34 3-HOLD |
| PARROTHEAD | 0 | 0 | 0 | 300 | | 300 4-HOLD |
| LIVE NATION | 104 | 200 | 0 | 0 | | 304 5-HOLD |
| FLEX PRICING P1/P2 | 1232 | 0 | 0 | 0 | | 1232 6-HOLD |
| ISL | 180 | 177 | 125 | 0 | | 482 7-HOLD |
| BUILDING | 140 | 133 | 68 | 126 | | 467 8-HOLD |
| ADA | 154 | 12 | 0 | 0 | | 166 9-HOLD |
| | | | | | | |
| TOTAL HOLDS: | 3638 | 1704 | 743 | 426 | 6511 | |
| | | | | | | |
| | | | | | | |
| AVAILABLE TO PURCHASE: | 2730 | 3026 | 1483 | 1084 | 8323 | |

| JIMMY BUFFETT | | | | | | |
|---|---|---|---|---|---|---|
| August 4th 2012 8pm | | | | | | |
| Boardwalk Hall | | | | | | |
| Atlantic City, NJ | | | | | | |
| | | | | | TOTAL | |
| | $228.00 | $158.00 | $98.00 | $68.00 | CAPACITY | |
| CAPACITY: | 2417 | 4249 | 3130 | 4162 | | 13958 SEATING CAP |
| LESS (flex) KILLS: | 0 | 80 | 0 | 0 | | 80 === |
| SELLABLE CAPACITY: | 2417 | 4169 | 3130 | 4162 | | 13878 NET CAP |
| | | | | | | |
| | | | | | | |
| PRODUCTION HOLDS | 0 | 0 | 0 | 0 | 0 | |
| BAND | 446 | 48 | 0 | 0 | 494 | |
| MARGARITAVILLE | 30 | 0 | 0 | 0 | 30 | |
| LANDSHARK | 75 | 0 | 0 | 0 | 75 | |
| PROMOTIONS | 4 | 0 | 124 | 0 | 128 | |
| LIVE NATION | 50 | 0 | 0 | 50 | 100 | |
| BUILDING | 80 | 60 | 98 | 138 | 376 | |
| FAN CLUB | 0 | 0 | 0 | 300 | 300 | |
| ISL/Casino Buy | 228 | 219 | 72 | 0 | 519 | |
| ADA | 60 | 60 | 60 | 16 | 196 | |
| | | | | | | |
| TOTAL HOLDS: | 973 | 387 | 354 | 504 | 2218 | |
| | | | | | | |
| | | | | | | |
| TOTAL FLEX: | 0 | 2016 | 1069 | 2015 | 5100 | |
| | | | | | | |
| AVAILABLE TO PURCHAS | 1444 | 1766 | 1707 | 1643 | 6560 | |

24.  Defendants withheld more than 5% of all available tickets to each Jimmy Buffet concert in violation of the Statute.

25.  The same is true for concerts by Britney Spears in 2011 (over 940 tickets withheld) and Elton John in 2008 (over 4,500 tickets withheld).  Charts showing those holds are set forth below.

**BRITNEY SPEARS**
**Femme Fatale Tour 2011**

Hold Info

Print Date: 10/22/2015
Print Time: 1:07 PM

**CITY:** Atlantic City          **VENUE:**          **Boardwalk Hall**

**DATE:**     Sat Aug 6/11

| TICKET HOLDS PAY FORS: | PL1 | PL2 | PL3 | PL4 | PL5 | TOTAL | Hold Code | Location Notes |
|---|---|---|---|---|---|---|---|---|
| Britney Spears | 4 | 100 | | | | 104 | 1#brit | P1=front row next to runway.  For P2 see holds map. |
| Nicki Minaj | | 60 | | | | 60 | 1#nick | see holds map |
| Support Acts | | 40 | | | | 40 | 1#supp | decent stands but no better than Britney or Minaj holds |
| WME | | 10 | | | | 10 | 2#wme | decent stands no further than b-stage, in lower half of section |
| LN-LA Touring | 2 | 30 | | | | 32 | 2#lnla | P1=front row next to Britney front row.  For P2 see holds map. |
| LNGT | | 10 | | | | 10 | 2#lngt | decent stands no further than b-stage, in lower half of section |
| Britney Label-Sony | | 40 | | | | 40 | 3#blab | P1=front row next to LN-LA front row. P2=good stands no further than one section past b-stage |
| Minaj Label | | 20 | 10 | | | 30 | 3#nlab | P2=no worse than Britney label holds. P3=best |
| Support Acts Labels | | 20 | 20 | | | 40 | | cannot be better than Britney or Minaj label holds |
| Tour Sponsor | | 50 | | | | 50 | 2#spon | see holds map |
| Venue | | 108 | 50 | 60 | | 218 | 8, 7# | hall, ISL #hilton,nugget |
| LN Local | | 50 | | | | 50 | 5 | no floor or P5 holds |
| LN Exec/Alliance | | 30 | 10 | | | 40 | 2#inex | include some great stands, otherwise no further than one section past b-stage |
| Platinum | | | | | | | | see holds map |
| Public Holdback | | | | | | | | P1=back half of floors.  P2=a few floors but mostly stands, scattered mid-grade seats. P3-P5=scattered.  Also hold additional sections as noted in email. |
| PRESALES: | | | | | | | | |
| Britney Presale | | | | | | | | see holds map |
| Minaj Presale | | | | | | | | see holds map |
| Citi Presale | | | | | | | | remaining opens but include some great seats (sharing with Britney presale) |
| Citi Preferred | | | | | | | n/a | Not a presale. 400 total, will confirm locations later but to come from P1-P3 |
| ln.com/radio/venue | | | | | | | | selling from Citi inventory (whatever is left by Wednesday |
| VIP Pkg-front row | | | | | | | | see holds map |
| VIP Pkg-hospitality | | | | | | | | see holds map |
| VIP Pkg-gold | | | | | | | | see holds map |
| VIP Pkg-silver | | | | | | | | see holds map |
| COMPS: | | | | | | | | |
| Radio Promo-Local | 8 | | | 198 | | 206 | 4#radi | P1=off centre in back half of P1's. P2/P3=mid-grade stands not the best |
| Radio Promo-Nat'l | | | | | | | | EW P2 hold must be within first 2 rows in stands no further than B-stage |
| Reviewer | | 10 | | | | 10 | 4#rev | In section facing B-stage, 4+6 on aisle between rows 8-10 |
| TOTAL | 14 | 578 | 90 | 258 | | 940 | | |

**THE HOLDS ARE TO BE MANAGED AS FOLLOWS**
No seats may be held on the floor or at the lowest price unless authorized by Live Nation Global Touring (LNGT).
Orders may be processed once LNGT have approved the final manifest, starting the day after public onsale.
ALL SEATS HELD ARE CONSIDERED SOLD.  THERE ARE NO RETURN PRIVILEGES.
No comps unless authorized by LNGT, or unless they are contractually agreed upon.
Assign only even amounts per row, no odd numbers unless asked for (outside of presale allotments, they may get odd numbers of seats).

Britney2011-3sheet-Atlantic City Hold Info

Live Nation Global Touring
Toronto, CANADA

| | $227.00 | $177.00 | $127.00 | $87.00 | $67.00 | TOTAL CAPACITY | |
|---|---|---|---|---|---|---|---|
| **ELTON JOHN** | | | | | | | |
| **SATURDAY, JULY 19, 2008** | | | | | | | |
| **BOARDWALK HALL** | | | | | | | |
| **ATLANTIC CITY, NJ** | | | | | | | |
| CAPACITY: | 5110 | 2896 | 2649 | 4589 | 2046 | 17290 | |
| LESS KILLS: | 64 | 1844 | 1166 | 40 | | 3114 | |
| SELLABLE CAPACITY: | 5046 | 1052 | 1483 | 4549 | 2046 | 14176 | |
| | | | | | | | |
| HOLDS AFTER FLEX | | 120 | 120 | | | 240 | D-HOLD |
| CAESARS | 1450 | | 950 | 20 | | 2420 | E-HOLD |
| HRA | 88 | | | | | 88 | 1-HOLD |
| BAND | 294 | | | | | 294 | 2-HOLD |
| FAN CLUB | 150 | | | | | 150 | 3-HOLD |
| LIVE NATION | 600 | | | | | 600 | 4-HOLD |
| FLEX | 1310 | 0 | | | | 1310 | 5-HOLD |
| | | | | | | 0 | 6-HOLD |
| CASINO | 230 | 20 | 415 | 95 | | 760 | 7-HOLD |
| BUILDING | 92 | | | 102 | 70 | 264 | 8-HOLD |
| ADA | 90 | 30 | 30 | 34 | 12 | 196 | 9-HOLD |
| | | | | | | 0 | |
| | | | | | | 0 | |
| PRODUCTION/FLEX KILLS | | | | | | 0 | === |
| | | | | | | | |
| TOTAL HOLDS: | 4304 | 50 | 1395 | 251 | 82 | 6082 | |
| | | | | | | | |
| AVAILABLE TO PURCHASE: | 742 | 1002 | 88 | 4298 | 1964 | 8094 | |

26.   Defendants withholding of tickets for the Britney Spears and Elton John concerts was in excess of 5% of all available tickets and violated the Statute.

27.   For Kayne West's 2014 tour, Defendants sent out ticketing information to all venues that were hosting concerts. The ticketing information documents shows that Defendants withheld tickets to **every** Kanye West concert regardless of venue.   The instructions, as set forth below, also indicate that only 10% of each price level after holds should be released to the general public.

*Holds/ offer setup are listed in the order of priority.*

**(-TRMK) Live Nation Tour Marketing: 10 tickets total**
-6 GA PIT (in the GA area by the stage/thrust)
-4 P1 Reserved best 25% of house

**(-LNT) LN Touring: 20 tickets**
-20 P1 Reserved tickets in rows 1-10 first two sections sidestage in the stands

\* \* \*

**(-ART) Kanye West: varies**
-150 tickets total: 75 GA Floor (regular GA floor, not VIP GA), 75 P1 Reserved -
intermixed with VIP and Platinum as best as possible -
-*Uniondale & Newark*: 300 tickets total: 150 GA Floor (regular GA floor, not VIP),
150 P1 Reserved - intermixed with VIP and Platinum as best as possible -

**(-CAA) CAA Hold: 20 tickets**
-20 P1 Reserved tickets best available after holds above

**(-SPON) Sponsor : 30 tickets**
-30 P1 Reserved scattered best avail after holds above

**(-PRESS) Reviewer Comps: varies**
-6 P1 Reserved tickets best 25% of house
-Uniondale & Newark: 14 P1 Reserved tickets best 25% of house

**(-LABL) Label Hold: 40 ticket total**
-30 P1 Reserved tickets best avail scattered
-10 P2 Reserved Tickets best avail

**(-MKTG) Local Marketing: varies**
Varies per local marketing needs with tour approval from Kelly Strickland - Live Nation

16

**Venue Holds – Vary by Market:**
Standard Venue Holds

**(-PUBL) Public Holdback:**
 - 10% of each price level after Holds, please mix in some good locations.
 -to be released onto general Opens at the conclusion of the presale period

28.  Defendants' withholding of tickets to the Kanye West concert in New Jersey was in excess of 5% of all available seating and in violation of the Statute.

29.  For Phish's 2013 Fall Tour, Defendants withheld at least 3,859 tickets out of 14,135 or 27% of the available tickets for each of the three dates Phish performed, as set forth in the chart below.  The withholding of more than 5% of the available seats to the 2013 Phish concerts violated the Statute.

```
S3 / Ticket Limits / Availability
LEVEL         GA       RES       RES       RES     Totals
L-PASS      174.00   174.00    174.00    174.00
-------------------------------------------------------------------------
PLevels      1-7      8-42      43-58     59-70
(X Nums)              80-96     71-79
-------------------------------------------------------------------------
Capacity     3065     4619      5539       912    14135
Total Opens   357      626       998       184     2165
Selcls Opens    0        0         0         0        0
Obson Opens     0        0         0         0        0
-------------------------------------------------------------------------
Total Holds   989     1548      1085       237     3859
Selcls Holds    0        0         0         0        0
Obson Holds     0        0         0         0        0
Usld Q Holds    4       33        80        13      130
-------------------------------------------------------------------------
```

30.  In addition, Defendants withheld at least 1,319 tickets for each of the three shows of Phish's 2010 Fall Tour at Boardwalk Hall.  The chart below shows the withheld tickets.

```
-------------------------- UNSOLD TICKETS --------------------------
OPEN      1332    1484    2607    420    5843    350580.00
2-LABL            40                      40      2400.00
3-BOX      50     169     109      36     364     21840.00
4-LNVP            104                     104      6240.00
6-LN       70     280                     350     21000.00
8-HALL     60     212     108             380     22800.00
9-ADA             196                     196     11760.00


UNSOLD    1512    2485    2824    456    7277    436620.00


SEATING
CAP       3065    4619    5539    912   14135    848100.00


NET
CAP       3065    4619    5539    912   14135    848100.00
```

31.   Defendants' withholding of more than 5% of all available seats to the Phish concerts in 2010 was a violation of the Statute.

32.   Defendants withheld approximately 2,519 tickets for the Maroon 5 concert at the IZOD Center.   This consisted of the following holds:

       a. 178 labeled "Comp"

       b. 22 labeled "Open"

       c. 14 labeled "D-Hold"

       d. 932 labeled "E-Hold"

       e. 110 labeled "2-Bldg" for IZOD Center/NJSEA holds

       f. 142 labeled "4-Res"

       g. 162 labeled "5-Hold"

       h. 462 labeled "6-Hold"

       i. 86 labeled "8-Hold"

       j. 261 labeled "9-Hold"

       k. 2 unknown holds

33.   From those holds for the IZOD Center/NJSEA at least eight Maroon 5 tickets ranging from $291 to $460 were for sale on the secondary ticket market.   The highest valued box-office ticket that night, according to the manifest, was $121.00.

34.   Defendants withheld more than 5% of all available seats to the Maroon 5 concert on February 23, 2013 in violation of the Statute.

35.   Defendants also withheld 84% of tickets to Pink's March 2013 concert at the IZOD Center in East Rutherford, New Jersey making only 16% available at the general public on sale.[1]   This was a violation of the Statute.

36.   In addition, Defendants withheld 67% of tickets to One Direction's July 2013 concert at the IZOD Center in East Rutherford, New Jersey making only 33% available at the general public on sale.[2]   This was a violation of the Statute.

37.   Further, many of the seats withheld by Defendants for the One Direction concert were then posted for resale on secondary market websites.

38.   Defendants' withholding of tickets set forth above spans 6 years, 22 different artists, and numerous venues across the United States.

---

[1]  http://www.fanfreedom.org/shows-with-holdbacks/,  last  visited March 27, 2015
[2]  http://www.fanfreedom.org/shows-with-holdbacks/,  last  visited March 27, 2015

39.  This pattern of behavior represents Defendants' custom and practice of withholding in excess of 5% of tickets to the Concerts no matter what artist was performing and no matter where the concert was being held in violation of the Statute.

40.  Defendants withholding of tickets in violation of the Statute is a systemic problem that is not confined to one artist or arena.

41.  Defendants withheld, and continue to withhold, tickets from sale to the general public for the benefit of, <u>inter alia</u>, the venue, sponsors, artists, media outlets, and other insiders for the Concerts in New Jersey.

42.  In 1997, then New Jersey Governor Christine Todd Whitman signed legislation establishing the Ticket Brokering Study Commission ("Commission") that <u>inter alia</u> was to compare the impact of regulated and deregulated ticket resale markets for entertainment and sporting events in New Jersey. The Commission issued a report dated October 31, 2001 ("Report") which made a number of findings regarding the causes of ticket unavailability to the general public, and the resulting diversion of tickets from the initial sales to re-sales in the secondary market at prices higher than face value. The Report found widespread holdback of tickets from sale to the general public and the diversion of those tickets to artists, venues, sponsors, promoters, and other insiders. Many of the tickets that were held back and diverted to others were then resold in the secondary market at substantially

more than the face value of the ticket. The Commission concluded that "Hold-backs disproportionately affect the general public's opportunity to obtain tickets in favor of privileged insiders". Report at 26. The Commission recommended that the holdbacks be eliminated or curtailed by statute or regulation in order to insure that the general public will have better access to tickets.

43. Following the recommendations of the Commission, the New Jersey legislature enacted legislation which required that 95% of all tickets be made available to the public. That legislation was included in the New Jersey Consumer Fraud Act, which stands as one of the most protective consumer statutes in the country.

44. Defendants withholding of tickets as set forth above totals more than 5% of all available seating for each concert.

45. The aforesaid acts constitute a violation of the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1 *et*. *seq*. that resulted in damage to the plaintiffs and the plaintiff class.

46. The Statute applies to any "**person**, who has access to tickets to an event prior to the tickets' release for sale to the general public." N.J.S.A. 56:8-35.1 (emphasis added).

47. Defendants qualify as a person under the Statute as they have access to tickets to the Concerts prior to their release for sale to the general public.

48. As a result of the aforesaid actions of Defendants, Plaintiffs, Glickman, Kimmel, and the Plaintiff Class have been damaged.

49.   Plaintiffs and the Plaintiff Class seek injunctive relief, damages, compensation, interest, disgorgement, costs of suit, treble damages, attorneys' fees, and all other relief permitted under the CFA and/or the common law, and any other damages deemed just and proper by the Court from the Defendants.

50.   This class action is brought pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of all persons who purchased tickets to the Concerts at a ticket price that is higher than the face value of the ticket.  Excluded from the class are counsel representing the class and all persons employed by said counsel, governmental entities, Defendants, any entity in which Defendants have a controlling interest, Defendants' officers, directors, affiliates, legal representatives, employees, co-conspirators, successors, subsidiaries, and assigns, any judicial officer presiding over this matter, the members of their immediate families and judicial staff, and any individuals whose interest are antagonistic to other class members.

## II.  <u>JURISDICTION</u>

51.   This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), as the proposed class contains more than 100 members, at least one of whom maintains citizenship in a state diverse from Defendants, and seeks in the aggregate more than Five Millions Dollars ($5,000,000), exclusive of costs and interest.

### III. **PARTIES**

52.  Plaintiff Steven Glickman ("Glickman") is an individual residing at 18 Crescent Road, Livingston, New Jersey, a citizen of the State of New Jersey and a purchaser of tickets to Phish's 2013 Fall Tour on October 31, 2013.  Glickman is a representative plaintiff.

53.  Plaintiff, Andrew Kimmel ("Kimmel") is an individual residing in Edgewater, New Jersey, a citizen of New Jersey and a purchaser of tickets to Maroon 5's 2013 "Overexposed" tour at the IZOD Center on February 23, 2013.  Kimmel is a representative plaintiff.

54.  Defendant Live Nation Entertainment, Inc. is a foreign corporation engaged in the business of producing, promoting, and selling and distributing tickets to concerts and other live entertainment events and has access to tickets prior to their sale to the general public.  Its principal place of business is 9348 Civic Center Drive, Beverly Hills, CA 90210.

55.  Defendant Live Nation Worldwide, Inc. is a wholly owned subsidiary corporation of defendant Live Nation Entertainment, Inc. and is registered with the New Jersey Division of Revenue to conduct business in New Jersey, with its registered agent located in West Trenton, Mercer County, New Jersey.  LNW is responsible for promoting, selling, distributing, allocating and withholding tickets to concerts and has access to tickets prior to their sale

23

to the general public.  Its principal place of business is 9348 Civic Center Drive, Beverly Hills, CA 90210.

56.  Defendant Live Nation Concerts is a wholly owned subsidiary of LNE which involves the global promotion of live music events, the operation and management of music venues and the production of music festivals across the world.  LNC is responsible for promoting, selling, distributing, allocating and withholding tickets to concerts and has access to tickets prior to their sale to the general public.  Its principal place of business is 9348 Civic Center Drive, Beverly Hills, CA 90210.

57.  Defendant Live Nation Ticketing, LLC is a foreign limited liability company that is a wholly owned subsidiary of Defendant LNE.  LNT is responsible for promoting, selling, distributing, allocating and withholding tickets to concerts and has access to tickets prior to their sale to the general public. Its principal place of business is 9348 Civic Center Drive, Beverly Hills, CA 90210.

58.  Defendant Live Nation Global Touring is a foreign corporation engaged in the business of producing, promoting, and selling and distributing tickets to concerts and other live entertainment events and has access to tickets prior to their sale to the general public.  Its principal place of business is 9348 Civic Center Drive, Beverly Hills, CA 90210.

59.  Defendants ABC Corp. 1-20 are fictitious names for various subsidiary, parent, predecessor, and/or acquiree entities

of Defendants or other entities or persons that have had any interest in or control over the sale, presale, distribution, allocation, or holdback of tickets to the Concerts from sale to the general public and has access to tickets prior to their sale to the general public.

### IV. <u>VENUE</u>

60. Venue in this action properly lies in this District, pursuant to 28 U.S.C. Sec. 1319(a) and the Defendants are subject to personal jurisdiction in the District in which this action is filed.

### V. <u>FACTUAL BACKGROUND</u>

61. Defendants are responsible for promoting the Concerts and for the distribution, sale, allocation, holdback and/or supply of tickets to the Concerts.

62. Defendants withheld and continue to withhold more than 5% of tickets to the Concerts from sale to the general public.

63. Defendants' practice of withholding more than 5% of its tickets to the Concerts from sale to the general public violates the New Jersey Consumer Fraud Act.

64. Due to the Defendants' withholding of tickets to the Concerts in violation of the Statute, Glickman and Kimmel paid more for tickets on the secondary market than they would have if Defendants had not violated the Statute and made 95% of tickets available to the general public.

65.  Had Defendants complied with the Statute and made 95% of the tickets to the Concerts available to the general public the cost for tickets on the secondary market would have been less. See Rascher Decl. at Exhibit A.

66.  Plaintiffs retained Dr. Rascher, an economist who specializes in the economic analysis of concerts, sports, and ticketing to opine on the effect Defendants' withholding of tickets had on the price of tickets in the secondary market and what would happen to prices on the secondary market if Defendants did not withhold tickets in violation of the Statute.

67.  Dr. Rascher's qualifications are as follows: he is the Director of Academic Programs for the Sport Management Master's Program and Professor at the University of San Francisco ("USF"). He teaches courses in sport economics and finance and research methods to graduate students.  Dr. Rascher is also a Partner of OSKR, LLC, an economic consulting firm specializing in applying economic analysis to complex legal issues, as well as President of SportsEconomics, LLC, ("SportsEconomics") an economic, finance, and marketing research consulting firm focused on the sports industry.  Dr. Rascher was an Assistant Professor and Associate Professor at USF, an Assistant Professor at the University of Massachusetts, Amherst, Adjunct Professor at Northwestern University, and Visiting Professor at the IE Business School in Madrid, Spain.  He was also previously a Principal at LECG, LLC, a provider of expert economic consulting and related services.  He

received a Ph.D. in Economics from the University of California at Berkeley, having focused on the fields of industrial organization, econometrics, and labor economics.  Dr. Rascher has published numerous articles, book chapters, and a textbook in the field of sports economics and finance and have worked on over one hundred consulting projects involving the sports, entertainment, and tourism industries.  With respect to ticket markets and pricing in sports and entertainment, he has published research on the effects (in terms of quantity and price) of restricting the resale of tickets to concerts, on the effect on price and demand of National Football League (NFL) resale ticketing markets, the impact of variable ticket pricing on demand in Major League Baseball (MLB), and on the sources of NFL stadium financing and the subsequent impact on ticket prices.  Additionally, Dr. Rascher was an invited speaker at an academic and industry conference on ticket pricing where he discussed primary pricing, secondary pricing, bundled pricing, etc.  Further, he provided expert economic analysis and opinions in *Phillips et al. v. Comcast Spectacor et al.,* in a case involving the valuation of certain tickets to a special National Hockey League (NHL) event.  Additionally, he was an invited speaker at an academic and industry conference on ticket pricing where he discussed primary pricing, secondary pricing, bundled pricing, etc.  Further, Dr. Rascher provided expert economic analysis and opinions in *Phillips et al. v. Comcast Spectacor et al.,* in a case involving the valuation of certain tickets to a special National

Hockey League (NHL) event. Beyond what has already been listed, Dr. Rascher has consulted on a number of mergers in the music venue industry involving SFX, Clear Channel, and Nederlander, with his primary focus on ticket pricing at these events in the actual and but-for worlds. In addition to what has already been described, much of his research centers on understanding the demand and pricing of sporting events/teams/leagues, which entails the economics of the factors at issue in this lawsuit. Beyond the studies already listed, Dr. Rascher has published on the demand for college football,[3] professional soccer,[4] professional hockey,[5] professional basketball,[6] and professional baseball.[7] Dr. Rascher

---

[3] "The Demand for College Football Bowl Games," with Terence Eddy. In *International Journal of Sport Finance*, Vol. 11, No. 2, February 2016. And, "The Impact on Demand from Winning in College Football and Basketball: Are College Athletes More Valuable than Professional Athletes?" with Chad McEvoy. In *Selected Proceedings of the Santa Clara University Sports Law Symposium*, September 2012.

[4] "If We Build It, Will They Come?: Examining the Effect of Expansion Teams and Soccer-Specific Stadiums on Major League Soccer Attendance," with Steve Shapiro and Tim DeSchriver. In *Sport, Business, and Management: An International Journal*, Vol. 6, No. 2, Spring 2016. And, "An Analysis of Expansion and Relocation Sites for Major League Soccer" with Matthew Baehr, Jason Wolfe, and Steven Frohwerk. In *International Journal of Sport Management*, Vol. 7, No. 1, January 2006.

[5] "Where did National Hockey League Fans go During the 2004-2005 Lockout?: An Analysis of Economic Competition Between Leagues," with Matthew Brown, Mark Nagel, and Chad McEvoy. In *International Journal of Sport Management and Marketing*, Vol. 5, Nos. 1, 2, January 2009.

[6] "The Effects of Roster Turnover on Demand in the National Basketball Association," with Steve Shapiro, Alan Morse, and Chad McEvoy. In *International Journal of Sport Finance*, Vol. 3, No. 1, February 2008. And, "Do Fans Want Close Contests?: A Test of the Uncertainty of Outcome Hypothesis in the National Basketball Association" with John Paul Solmes. In *International Journal of Sport Finance*, Vol. 3, No. 2, August 2007. And, "NBA Expansion and Relocation: A Viability Study of Various Cities" with Heather Rascher. In *Journal of Sport Management*, Vol. 18, No. 3, July 2004.

[7] "Does Bat Day Make Cents?: The Effect of Promotions on the Demand for Baseball," with Mark McDonald. In *Journal of Sport Management*, Vol. 14, No. 1, January 2000. And, "A Test of the Optimal Positive Production Network Externality in Major League Baseball," in E. Gustafson and L. Hadley, eds., *Sports Economics: Current Research*, 1999. Praeger Press.

is also certified as a valuation analyst (Certified Valuation Analyst) by the National Association of Certified Valuators and Analysts.  See Rascher Decl. at ¶¶1-5.

68.  Dr. Rascher's opinions and the basis for those opinions are contained in his Declaration which is attached hereto as Exhibit A and is incorporated herein in its totality.  Dr. Rascher's Declaration identifies the issues that he addresses in this litigation:

> a.  whether Live Nation's practice of withholding more than 5% of available tickets resulted in an increase in ticket prices in the secondary market;
> b.  whether having a higher quantity of tickets in the secondary market (i.e., available for resale) is likely to lead to lower prices for resold tickets;
> c.  whether it is likely that if more tickets were sold to the general public instead of withheld (and given to partners and others, but not the general public), that more of those tickets would initially end up on the secondary market and/or would be sold for lower prices.

Rascher Decl. at ¶8.

69.  Dr. Rascher based his opinions on economic literature on ticket pricing and general economic principles, and his extensive background and experience in economic and ticketing issues.  Dr. Rascher's opinions have been thoroughly researched and analyzed. See Rascher Decl. at ¶10.

70.  Dr. Rascher's opinions are as follows:

## 3.1 A HIGHER QUANTITY OF TICKETS AVAILABLE IN THE SECONDARY MARKET WOULD LEAD TO LOWER PRICES

11. It is a cornerstone of economics that increased supply, all else equal, leads to lower prices. This conclusion stems from the first law of demand, which states that quantity demanded declines with increases in price.[8] This general conclusion has been shown to be true for the sale and resale of event tickets as well, in sports, music, and ticketed events more generally.

12. There have been a number of studies on secondary markets for tickets to music and sports events. Consistently, these studies find that the laws of demand and supply apply.[9] My own research (co-authored with Andrew Schwarz), demonstrates how secondary sales improve consumer welfare and then provided empirical support, analyzing comparable concerts in which resale was discouraged with those in which it was not. The results were stark: the market with restricted resale showed higher prices (with markups as much as 6 times higher) and lower quality seats available for sale – strong evidence of the laws of supply and demand.

---

[8] Mankiw, G. N. (2015). Principles of Economics, 7th edition. Stamford, CT: Cengage Learning, p. 67.

[9] See Happel, S. K., and Marianne, M. J. (1995). The folly of anti-scalping laws. *Cato Journal, 15*(1), pp. 65-80; Spindler, Z. A. (2003). How "parasites" serve their host: a graphical analysis of "scalping". *Public Finance Review, 31*(6), pp. 694-699; Courty, P. and Pagliero, M. (2009). Price discrimination in the concert industry. *Centre for Economic Policy Research*, Discussion Paper No. 7143. Moreover, many of these secondary ticket studies apply a demand and supply framework. See Leslie, P. and Sorensen, A. (2009). The welfare effects of ticket resale. *National Bureau of Economic Research*, Working Paper No. 15476; Krueger, A. B. and Pray, M. C. (2008). Evidence on the secondary market for concert tickets. *Research Gate*, Publication No. 22886279; Depken, C. A. (2006). The impact of new stadiums on professional baseball team finances. *Public Finance and Management, 6*(3), pp. 436-474; Karp, L. and Perloff, J. M. (2005). When promoters like scalpers. *Journal of Economics & Management Strategy, 41*(2), pp. 477-508; Swofford, J. L. (1995). Arbitrage, speculation, and public policy toward ticket scalping. *Public Finance Review, 27*(5), pp. 531-540; Geng, X., Wu, R., and Whinston, A. B. (2007). Profiting from partial allowance of ticket resale. *Journal of Marketing, 71*(2), pp. 184-195; Sweeting, A. (2012). Dynamic pricing behavior in perishable goods markets: evidence from secondary markets for Major League Baseball tickets. *Journal of Political Economy, 120*(6), pp. 1133-1172.

13.  The same findings hold for other sorts of events.  Alan Krueger studied pricing in the secondary market for tickets to Super Bowl XXXV and suggested that "maybe the market value of a ticket if the entire stadium were on the auction block [instead of an estimated 20%] would be substantially less than the prices attained in the secondary market."[10]

14. My research (co-authored with Joris Drayer and Chad McEvoy) analyzed thousands of NFL ticket transactions across hundreds of games in the secondary market.  It showed that "the more 'scarce' the ticket is, as evidenced by the percentage of capacity that is sold out, the higher the transaction price will be."[11]  Thus, tickets in the secondary market follow the standard laws of supply and demand, whereby lower supply raises prices.

15. Drayer (2011) also notes that a significant increase in the number of tickets sold on the secondary market is likely to lead to lower prices.[12]  Sweeting (2012) notes that for MLB games with higher expected attendance, more tickets enter the secondary market.[13] Geng, Wu, and Whinston (2006) model a framework (structured on the sale of concert tickets at a university) and conclude that a partial allowance of resale "benefits both a monopoly seller and consumers, leading to a Pareto improvement."[14]  (A Pareto improvement is one where some or all market participants are made better off while no market participants are harmed.)

## 3.2  If Fewer Tickets Were Withheld, Prices Paid by the General Public Would Be Lower

---

[10] Krueger, A. B. (2001). Supply and demand: an economist goes to the Super Bowl. *The Milken Institute Review, 2001*(2), p. 26.

[11] Drayer, Rascher, and McEvoy (2012), p. 456.

[12] Drayer, J. (2011). Making a case for the integration of the primary and secondary ticket markets for professional team sports in the United States. *International Journal of Sports Marketing & Sponsorship, 12*(3), pp. 199-208.

[13] Sweeting, A. (2012). Dynamic pricing behavior in perishable goods markets: evidence from secondary markets for Major League Baseball tickets. *Journal of Political Economy, 120*(6), p. 1146.

[14] Geng, X., Wu, R., and Whinston, A.B. (2006). Profiting from partial allowance of ticket resale. *International Industrial Organization Conference, 2006*, Paper ID 523 at editorialexpress.com.

16. As alleged, AEG promoted six specific concerts at Metlife Stadium and the Prudential Center, as well as numerous other concerts in New Jersey, where "more than 5% of tickets" were withheld from sale to the public.[15]   In contrast with a less restrictive world in which 95% or more of the tickets were sold directly to the public, it is my opinion to a reasonable degree of economic certainty that the current system resulted in (a) higher prices for the tickets that did make it to the public in the secondary market, and (b) fewer tickets being available for the general public.  In other words, the current system of excluding more than 5% of concert tickets from sale to the general public results in fewer tickets being available to the general public (in both the primary and the secondary markets) and for tickets available in the secondary market to sell at higher prices.

17. Based on this finding, it is my opinion to a reasonable degree of economic certainty that the current system results in higher prices for resold tickets than would a system in which supply and demand were better matched up initially and in which any mismatches were resolved by individual bilateral transactions (fan to fan) rather than promotor to broker to fan.

18. Markets with a higher concentration of sellers typically result in higher prices in those markets.  Many studies have been done analyzing the relationship between concentration and price, and "these studies all show strong evidence of a positive relationship between concentration and the level of price."[16] This same general result, that increased seller concentration results in higher prices, has been shown to apply for ticket resale as well.  Elfenbein (2006) found that states with higher concentrations of

---

[15] Paragraphs 24, 32, 34, and 45 of *Third Amended Complaint – Class Action* (*Jessica Pollard v. AEG Live, LLC et al.*).
[16] Waldman, D.E., and Jensen, E.J. (1998).  *Industrial Organization: Theory and Practice*.  Addison-Wesley. P. 454.

ticket resellers experienced higher prices.[17] Moreover, the New York Attorney General released a recent study of concert tickets, showing that brokers dealing in larger quantities are able to charge higher prices than those dealing in lesser quantities.[18] This matters because when the general public resells tickets that it does not want to use, these individuals can transact directly through a modern, on-line ticketing platform where the buyer is another member of the general public (which is an important technological change from earlier forms of ticket resale). However, when held-back tickets are resold through a broker (either because the recipients of the tickets are not supposed to sell the ticket, either at all or above face value,[19] or it might bring negative unwanted publicity to the person[20]) who then uses various ticketing resale platforms to sell the ticket. Thus, there is an additional layer in the supply chain prior to the ticket making into the secondary market that is available to the public. If that additional layer were provided competitively, the effect on price might be small, but in this market the intermediaries are highly concentrated (as discussed above).[21] Thus, imposing an additional layer in the supply chain creates

---

[17] Elfenbein, D.W. (2006). Do anti-ticket scalping laws make a difference online? Evidence from internet sales of NFL tickets. *Social Science Research Network*, Abstract ID 595682, pp. 0, 24. Elfenbein finds that states with more regulations of the secondary market have fewer resellers, higher concentrations of resellers, and high prices.

[18] A repeated finding of the report is that some brokers use automated bots, computer programs that can purchase hundreds of tickets in seconds. The report states that "Our analysis…reveals that the brokers that commanded the greatest markups in the ticket resale market were those that used Ticket Bots." See Office of New York State Attorney General Eric T. Schneiderman (2016), "Obstructed View: What's blocking New Yorkers from getting tickets," p. 26, at on.ny.gov/20vdr9p.

[19] Tom Ley (2015), "How players manage to scalp their Super Bowl tickets," Deadspin, Feb. 10, at bit.ly/1RJ5kza.

[20] ESPN (2005), "Tice expects 'big fine' for actions," ESPN, Mar. 10, at es.pn/1ROnqWI.

[21] The federal antitrust authorities define "highly concentrated" markets as those with a Hirschman-Herfindahl Index (HHI) of 2,500 or higher. See Horizontal Merger Guidelines of the U.S. Department of Justice and the Federal Trade Commission (http://1.usa.gov/21jA9Tt). With 34.4% share, PrimeSport's contribution to HHI exceeds 2,500.

a problem known as "double marginalization," which results in higher prices to customers.[22]

19.  Second, and relatedly, consumer sellers often sell tickets for lower prices than professional brokers for various reasons.  The simplest explanation is the one provided above: individual fans have no market power and thus tend to see their price driven down towards their marginal costs.  As noted in a comprehensive study for the Department of Culture, Media, and Sport of the United Kingdom (covering sporting and music events and thousands of participants in those markets):

> It should be noted that, for a professional broker, these consumer sellers are spoilers of the market. To stay in business a professional reseller has got to sell above his purchase price. A consumer seller is not so constrained. For them, the price paid for a ticket once bought is essentially a bygone. In the end he will either use the ticket or sell it for whatever he can get for it. They have effectively no overheads and no advertising costs. They have no future activity to protect. ***As such they tend to drive down the prices on the secondary market***.[23]

20.  While the question of whether the amount of withheld tickets affects secondary market quantity and prices is a very narrow and specific question, the aforementioned UK study found that <u>whenever</u> tickets are withheld for an event, higher prices tend to ensue on the secondary market.  Specifically:

> It will already be apparent that the way in which primary selling is managed is of direct importance to

---

[22] See Waldman, D.E., and Jensen, E.J. (1998).  *Industrial Organization: Theory and Practice*.  Addison-Wesley. Pp. 406-409.

[23] Europe Economics. (2009). Analysis of the secondary sales market for tickets for sporting, cultural and other events. Published Sep. 14, 2009, p. 24, at bit.ly/1MrSOCc.  Emphasis added.

the way in which the re-sale market is established and developed. Fundamentally, given a popular event with excess demand, *the policies of the primary seller with respect to pricing, allocation and control of re-sale will largely determine volume and pricing in the secondary market*.

Primary sellers are not necessarily transparent in their disposition of tickets. In many cases the majority of primary market tickets do not change hands at the box office but are allocated to season ticket holders, corporate hospitality events, fan clubs, organisers, agents, players and producers. It has been known for a major event to be sold out within 90 seconds of the opening of the box office.

*These practices <u>necessarily</u> restrict supply and thus increase the opportunities for enhanced premia on re-sale*.[24]

21. Similarly, when economists Alan Krueger and Marie Connolly Pray surveyed fans at 30 concerts in the U.S., they found that "reselling is much more common for shows that sell a higher proportion of tickets in the primary market."[25] That is, increasing primary sales to the public increases secondary supply, and then the law of demand kicks in to turn increased supply into lower prices.

22. Third, making 95% or more of tickets available to the general public in the but-for world would have satisfied more of the actual demand for concert tickets than in the actual world where more than 5% have been withheld. Satisfying more demand through the primary market lowers excess demand in the secondary market; thus it is my opinion to a

---

[24] Europe Economics (2009), p. 21.  Emphasis added.
[25] Krueger, A. B. and Pray, M. C. (2008). Evidence on the secondary market for concert tickets. *Research Gate*, Publication No. 228862794, p. 1.

reasonable degree of economic certainty that
making 95% of tickets available to the general
public would drive down ticket prices, all
else equal.

23. Thus, withholding tickets causes higher
prices to be paid by the general public.

24. Based upon the foregoing, Mr. Glickman
and Mr. Kimmel purchased tickets for the Phish
and Maroon 5 events, respectively, in a
secondary market in which prices were higher
than they would have been had AEG made 95% of
all tickets available for sale to the general
public.

Rascher Decl. at ¶¶11-24.

71. All the above establishes an injury-in-fact for Glickman
and Kimmel and satisfies Article III standing.

## **FACTS RELATING TO PLAINTIFFS**

72. On August 21, 2013, Plaintiff Glickman purchased two
tickets to Phish's 2013 Fall Tour.

73. Plaintiff Glickman paid $440.95 for the two tickets
which, was far in excess of the face value of the tickets.

74. Face value for the tickets was $57-$63 per ticket.

75. Prior to purchasing tickets on the secondary market,
Glickman attempted to purchase tickets at face value on
Ticketmaster.com but was unable to.

76. Defendants withheld from sale to the general public more
than 5% of the available tickets for the benefit of, inter alia,
sponsors, artists, media outlets, the venue, and other insiders to
Phish's October 31, 2013 concert in violation of the Statute

causing Glickman and the Plaintiff Class to purchase tickets at more than face value.

77.  Glickman's damages are the difference between what he paid and either the face value of the tickets or what the cost of the tickets would have been had Defendants complied with the Statute.

78.  Maroon 5's "Overexposed" tour was held at the IZOD Center on February 23, 2013 located in East Rutherford, New Jersey.  The maximum ticket price was $121.

79.  On February 6, 2013, Kimmel purchased 2 tickets to Maroon 5's February 23, 2013 concert.

80.  Kimmel paid $250 per ticket, which was far in excess of face value of the tickets.

81.  Prior to purchasing tickets on the secondary market, Kimmel attempted to purchase tickets at face value but was unable to do so.

82.  Defendants withheld more than 5% of tickets to the Maroon 5 concert from sale to the general public for the benefit of, inter alia, sponsors, artists, media outlets, the venue, and other insiders causing Kimmel and the Plaintiff Class to purchase tickets at more than face value.

83.  Kimmel's damages are the difference between what he paid and either the face value of the tickets or what the cost of the tickets would have been had Defendants complied with the Statute.

37

## CLASS ACTION ALLEGATIONS

84.  Plaintiffs brings this action on their own behalf, and as a class action on behalf of the class defined herein, pursuant to, and properly maintainable under Fed. R. Civ. P. 23(a) and Fed. R. Civ. P 23 (b) (3).  The class consists of potentially hundreds of thousands of ticket purchasers to the Concerts victimized by Defendants' unlawful practices.

85.  The class consists of all persons who paid for tickets to the Concerts at a ticket price that is higher than the face value of the ticket.  The class continues to expand as Defendants continue to violate the provisions of the NJCFA with respect to current and future concerts.  The class excludes counsel representing the class and all persons employed by said counsel, governmental entities, Defendants, any entity in which Defendants have a controlling interest, Defendants' officers, directors, affiliates, legal representatives, employees, co-conspirators, successors, subsidiaries, and assigns, any judicial officer presiding over this matter, the members of their immediate families and judicial staff, and any individual whose interests are antagonistic to other class members.

86.  Defendants subjected Plaintiffs and each of the class members to unlawful practices and harmed them in the same manner.  Now, Plaintiffs and each class member seek to enforce their rights and remedies pursuant to the New Jersey Consumer Fraud Act.

87.  <u>Numerosity</u>:   The proposed class is so numerous that individual joinder of all their members is impracticable.   While the exact number and identities of the class members are unknown at this time, such information can be ascertained through appropriate investigation and discovery.   It is estimated that the class consists of thousands of members.

88.  <u>Typicality</u>:   Plaintiffs' claims are typical of the claims of their respective Class members in that they suffered similar damages resulting from a single course of conduct by Defendants.   Each of the class members asserts the same legal causes of action.

89.  <u>Adequacy of Representation</u>:   Plaintiffs will fairly and adequately represent and protect the interests of the class. Plaintiffs have retained counsel with substantial experience in prosecuting complex lawsuits and class action litigation. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the class and have the financial resources to do so.   Neither Plaintiffs nor their counsel have any interests adverse to the class.

90.  <u>Superiority of Class Action and Impracticability of Individual Actions</u>:   Plaintiffs and the members of the class suffered harm as a result of Defendants' unlawful and fraudulent conduct.   A class action is superior to other viable methods for the fair and efficient adjudication of the controversy.   Individual joinder of all members of the class is impracticable. The damages

suffered by the individual members of the class will likely be relatively small, especially given the burden and expense of individual prosecution of the complex litigation necessitated by the actions of Defendants.  It would be virtually impossible for the individual members of the class to obtain effective relief from Defendants' misconduct.  Even if members of the class could sustain such individual litigation, it would still not be preferable to a class action, because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in the Second Amended Complaint.  By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale and comprehensive supervision by a single Court.  Economies of time, effort and expense will be fostered and uniformity of decisions ensured.

91.  Commonality: There are questions of law and fact common to Plaintiffs and the class that predominate over any questions affecting only the individual members of the class. The common questions of law and fact include, but are not limited to, the following:

a.  Whether Defendants withheld more than five percent (5%) of the tickets to the Concerts from sale to the general public;

b.  Whether Defendants' actions violated the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-35.1;

c.    Whether Plaintiffs and the putative class sustained damage and loss thereby;

d.    The scope, extent and measure of damages and equitable relief that should be awarded;

e.    Whether Defendants' acts and omissions entitle Plaintiffs and the class to treble damages, attorneys' fees, prejudgment interest and cost of suit;

f.    Whether Plaintiffs and the class are entitled to injunctive relief; and

g.    Whether Plaintiffs and the class are entitled to declaratory relief.

### COUNT I
### Violation of N.J.S.A. 56:8-35.1

92.  Plaintiffs, on behalf of themselves and all others similarly situated, repeat and reallege all prior allegations as if set forth at length herein.

93.  Defendants promote the Concerts and are responsible for the distribution, sale, allocation, holdback and/or supply of tickets to the Concerts.

94.  Defendants have access to tickets to the Concerts prior to the tickets' release for sale to the general public.

95.  Defendants withheld and continue to withhold more than 5% of tickets to the Concerts from sale to the general public.

96.   Such practice is in contravention of N.J.S.A. 56:8-35.1, which prohibits withholding more than 5 percent of tickets for all available seating from the public.

97.   Violation of this statute is a *per se* violation of the CFA and Defendants are strictly liable to the Plaintiffs and the class for such violations.

98.   Plaintiffs and the class members suffered ascertainable losses consisting of the difference between the price they paid for tickets on the secondary market and either the face value of the ticket or the price of tickets on the secondary market had Defendants made 95% of the tickets available to the general public and not violated the Statute, and accordingly were harmed by Defendants' conduct in violation of the CFA.

WHEREFORE, Plaintiffs demand judgment against the Defendants, on their behalf and that of similarly situated class members as follows:

a. Awarding all relief available pursuant to the CFA, including but not limited to treble damages, interests, costs of suit and attorney's fees;

b. Permanently enjoining Defendants from violating the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-35.3 and requiring that 95% of all tickets be made available to the general public; and

c. Granting such other relief as this Court deems just and proper.

## <u>DEMAND FOR TRIAL BY JURY</u>

    Plaintiffs hereby demand trial by jury as to all issues in the above matter.

                                        **NAGEL RICE LLP**
*Attorneys for Plaintiffs and Putative Class*

                                              *s/ Bruce H. Nagel*
Bruce H. Nagel, Esq.
103 Eisenhower Parkway
Roseland, New Jersey 07068
(973) 618-0400

Dated:  April 25, 2016

**EXHIBIT A**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

STEVEN GLICKMAN, and ANDREW
KIMMEL, on behalf of themselves and
the Putative class,

                    Plaintiffs,

        vs.

LIVE NATION ENTERTAINMENT, INC.,
LIVE NATION WORLDWIDE, INC.,
LIVE NATION CONCERTS, LIVE
NATION TICKETING LLC, LIVE
NATION GLOBAL TOURING, ABC
CORP. 1-20,

                    Defendants.

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

Civil Action No. 15-8041

DECLARATION OF DANIEL A. RASCHER

April 18, 2016

1.    **QUALIFICATIONS**

1.      My name is Daniel A. Rascher.  I am Director of Academic Programs for the Sport Management Master's Program and Professor at the University of San Francisco ("USF").  I teach courses in sport economics and finance and research methods to graduate students.  I am also a Partner of OSKR, LLC, an economic consulting firm specializing in applying economic analysis to complex legal issues, as well as President of SportsEconomics, LLC, ("SportsEconomics") an economic, finance, and marketing research consulting firm focused on the sports industry.  Formerly, I was an Assistant Professor and Associate Professor at USF, an Assistant Professor at the University of Massachusetts, Amherst, Adjunct Professor at Northwestern University, and Visiting Professor at the IE Business School in Madrid, Spain.  I was also previously a Principal at LECG, LLC, a provider of expert economic consulting and related services.  I received a Ph.D. in Economics from the University of California at Berkeley, having focused on the fields of industrial organization, econometrics, and labor economics.  I have published numerous articles, book chapters, and a textbook in the field of sports economics and finance and have worked on over one hundred consulting projects involving the sports, entertainment, and tourism industries.

2.      With respect to ticket markets[1] and pricing in sports and entertainment, I have published research on the effects (in terms of quantity and price) of restricting the resale of tickets to concerts,[2] on the effect on price and demand of National Football League (NFL) resale ticketing markets,[3] the impact of variable ticket pricing on demand in Major League

---

[1] Throughout this report, I use the terms "market" and "secondary market" as they are used in the ticketing industry.  I do not mean this as a conclusion about market definition in the antitrust use of the term.

[2] "The Antitrust Implications of "Paperless Ticketing" on Secondary Markets," with Andrew D. Schwarz.  In *Journal of Competition Law and Economics*, Vol. 9, No. 3, 2013.

[3] "An Examination of Underlying Consumer Demand and Sport Pricing Using Secondary Market Data" with Joris Drayer and Chad McEvoy.  In *Sport Management Review*, Vol. 15, No. 4, November 2012.

Baseball (MLB),[4] and on the sources of NFL stadium financing and the subsequent impact on ticket prices.[5]   Additionally, I was an invited speaker at an academic and industry conference on ticket pricing where I discussed primary pricing, secondary pricing, bundled pricing, etc.[6]   Further, I provided expert economic analysis and opinions in *Phillips et al. v. Comcast Spectacor et al.,*[7] in a case involving the valuation of certain tickets to a special National Hockey League (NHL) event.  Further, I have submitted a declaration on similar issues in *Finkelman et al. v. NFL et al*.

3.     Beyond what has already been listed, I have consulted on a number of mergers in the music venue industry involving SFX, Clear Channel, and Nederlander, with my primary focus on ticket pricing at these events in the actual and but-for worlds.

4.     In addition to what has already been described, much of my research centers on understanding the demand and pricing of sporting events/teams/leagues, which entails the economics of the factors at issue in this lawsuit.  Beyond the studies already listed, I have

---

[4] "Variable Ticket Pricing in Major League Baseball" with Chad McEvoy, Mark Nagel, and Matthew Brown.  In *Journal of Sport Management*, Vol. 21, No. 3, July 2007.

[5] "The Use of Public Funds for Private Benefit: An Examination of the Relationship between Public Stadium Funding and Ticket Prices in the National Football League" with Matthew Brown and Wesley Ward.  In *International Journal of Sport Finance*, Vol. 1, No. 2, June 2006.

[6] "Pricing the Game Experience," with Stephen Shapiro and Tim DeSchriver.  Invited research presentation at *Sport Entertainment & Venues Tomorrow* conference, 2013, University of South Carolina.

[7] Submitted two expert reports on class certification issues in regards to ticket holder lawsuit in *Phillips et al. v. Comcast Spectacor et al.*  2013.

Page 2

published on the demand for college football,[8] professional soccer,[9] professional hockey,[10] professional basketball,[11] and professional baseball.[12]

5.      I am also certified as a valuation analyst (Certified Valuation Analyst) by the National Association of Certified Valuators and Analysts.  Attached as Appendix A is my curriculum vitae which includes my qualifications as an expert witness and my testimonial experience, including my publications from the last 10 years and all cases in the last 4 years where I testified at trial or was deposed.

6.      I am being compensated at my usual and customary hourly rate of $500 per hour, plus reimbursement of expenses.  In my work on this matter, I have been assisted by OSKR staff, working under my supervision and control.  I have no direct financial interest in the outcome of this matter.

---

[8] "The Demand for College Football Bowl Games," with Terence Eddy.  In *International Journal of Sport Finance*, Vol. 11, No. 2, February 2016.  And, "The Impact on Demand from Winning in College Football and Basketball: Are College Athletes More Valuable than Professional Athletes?" with Chad McEvoy.  In *Selected Proceedings of the Santa Clara University Sports Law Symposium*, September 2012.

[9] "If We Build It, Will They Come?: Examining the Effect of Expansion Teams and Soccer-Specific Stadiums on Major League Soccer Attendance," with Steve Shapiro and Tim DeSchriver.  In *Sport, Business, and Management: An International Journal*, Vol. 6, No. 2, Spring 2016.  And, "An Analysis of Expansion and Relocation Sites for Major League Soccer" with Matthew Baehr, Jason Wolfe, and Steven Frohwerk.  In *International Journal of Sport Management*, Vol. 7, No. 1, January 2006.

[10] "Where did National Hockey League Fans go During the 2004-2005 Lockout?: An Analysis of Economic Competition Between Leagues," with Matthew Brown, Mark Nagel, and Chad McEvoy.  In *International Journal of Sport Management and Marketing*, Vol. 5, Nos. 1, 2, January 2009.

[11] "The Effects of Roster Turnover on Demand in the National Basketball Association," with Steve Shapiro, Alan Morse, and Chad McEvoy.  In *International Journal of Sport Finance*, Vol. 3, No. 1, February 2008.  And, "Do Fans Want Close Contests?: A Test of the Uncertainty of Outcome Hypothesis in the National Basketball Association" with John Paul Solmes.  In *International Journal of Sport Finance*, Vol. 3, No. 2, August 2007.  And, "NBA Expansion and Relocation: A Viability Study of Various Cities" with Heather Rascher.  In *Journal of Sport Management*, Vol. 18, No. 3, July 2004.

[12] "Does Bat Day Make Cents?: The Effect of Promotions on the Demand for Baseball," with Mark McDonald.  In *Journal of Sport Management*, Vol. 14, No. 1, January 2000.  And, "A Test of the Optimal Positive Production Network Externality in Major League Baseball," in E. Gustafson and L. Hadley, eds., *Sports Economics: Current Research*, 1999.  Praeger Press.

## 2.   SCOPE OF WORK

7.      Counsel has asked me to provide a declaration related to the economics of ticketing in music.

8.      Specifically, I was asked to provide economic evidence to determine:

   a.   whether Live Nation's practice of withholding more than 5% of available tickets resulted in an increase in ticket prices in the secondary market;

   b.   whether having a higher quantity of tickets in the secondary market (i.e., available for resale) is likely to lead to lower prices for resold tickets;

   c.   whether it is likely that if more tickets were sold to the general public instead of withheld (and given to partners and others, but not the general public), that more of those tickets would initially end up on the secondary market and/or would be sold for lower prices.

9.      In approaching this assignment, I have relied upon a number of documents, including material provided by counsel and third party files, laid out in full in Appendix B. I also rely on my knowledge of the economics literature; to the extent I specifically cite to an article or study, I include that title in this report and in my list of materials in Appendix B.

## 3.   SUMMARY OF OPINIONS

10.      It is important to note that the opinions I am offering in this report are based almost entirely on evidence from the economics literature on ticket pricing and general economic principles.  To my understanding, no specific fact discovery has yet taken place.  When such discovery occurs, I will supplement my opinions accordingly.

### 3.1   A HIGHER QUANTITY OF TICKETS AVAILABLE IN THE SECONDARY MARKET WOULD LEAD TO LOWER PRICES

11.      It is a cornerstone of economics that increased supply, all else equal, leads to lower prices.  This conclusion stems from the first law of demand, which states that quantity

demanded declines with increases in price.[13]  This general conclusion has been shown to be true for the sale and resale of event tickets as well, in sports, music, and ticketed events more generally.

12.     There have been a number of studies on secondary markets for tickets to music and sports events.  Consistently, these studies find that the laws of demand and supply apply.[14] My own research (co-authored with Andrew Schwarz), demonstrates how secondary sales improve consumer welfare and then provided empirical support, analyzing comparable concerts in which resale was discouraged with those in which it was not.  The results were stark: the market with restricted resale showed higher prices (with markups as much as 6 times higher) and lower quality seats available for sale – strong evidence of the laws of supply and demand.

13.     The same findings hold for other sorts of events.  Alan Krueger studied pricing in the secondary market for tickets to Super Bowl XXXV and suggested that "maybe the market value of a ticket if the entire stadium were on the auction block [instead of an estimated 20%] would be substantially less than the prices attained in the secondary market."[15]

---

[13] Mankiw, G. N. (2015). Principles of Economics, 7th edition. Stamford, CT: Cengage Learning, p. 67.

[14] See Happel, S. K., and Marianne, M. J. (1995).  The folly of anti-scalping laws. *Cato Journal, 15*(1), pp. 65-80; Spindler, Z. A. (2003).  How "parasites" serve their host: a graphical analysis of "scalping". *Public Finance Review, 31*(6), pp. 694-699; Courty, P. and Pagliero, M. (2009).  Price discrimination in the concert industry. *Centre for Economic Policy Research*, Discussion Paper No. 7143.  Moreover, many of these secondary ticket studies apply a demand and supply framework.  See Leslie, P. and Sorensen, A. (2009).  The welfare effects of ticket resale.  *National Bureau of Economic Research*, Working Paper No. 15476; Krueger, A. B. and Pray, M. C. (2008).  Evidence on the secondary market for concert tickets. *Research Gate*, Publication No. 22886279; Depken, C. A. (2006).  The impact of new stadiums on professional baseball team finances. *Public Finance and Management, 6*(3), pp. 436-474; Karp, L. and Perloff, J. M. (2005).  When promoters like scalpers.  *Journal of Economics & Management Strategy, 41*(2), pp. 477-508; Swofford, J. L. (1995).  Arbitrage, speculation, and public policy toward ticket scalping.  *Public Finance Review, 27*(5), pp. 531-540; Geng, X., Wu, R., and Whinston, A. B. (2007).  Profiting from partial allowance of ticket resale. *Journal of Marketing, 71*(2), pp. 184-195; Sweeting, A. (2012).  Dynamic pricing behavior in perishable goods markets: evidence from secondary markets for Major League Baseball tickets. *Journal of Political Economy, 120*(6), pp. 1133-1172.

[15] Krueger, A. B. (2001). Supply and demand: an economist goes to the Super Bowl. *The Milken Institute Review, 2001*(2), p. 26.

14.     My research (co-authored with Joris Drayer and Chad McEvoy) analyzed thousands of NFL ticket transactions across hundreds of games in the secondary market. It showed that "the more 'scarce' the ticket is, as evidenced by the percentage of capacity that is sold out, the higher the transaction price will be."[16]  Thus, tickets in the secondary market follow the standard laws of supply and demand, whereby lower supply raises prices.

15.     Drayer (2011) also notes that a significant increase in the number of tickets sold on the secondary market is likely to lead to lower prices.[17]  Sweeting (2012) notes that for MLB games with higher expected attendance, more tickets enter the secondary market.[18] Geng, Wu, and Whinston (2006) model a framework (structured on the sale of concert tickets at a university) and conclude that a partial allowance of resale "benefits both a monopoly seller and consumers, leading to a Pareto improvement."[19]    (A Pareto improvement is one where some or all market participants are made better off while no market participants are harmed.)

## 3.2    IF FEWER TICKETS WERE WITHHELD, PRICES PAID BY THE GENERAL PUBLIC WOULD BE LOWER

16.     As alleged, Live Nation promoted twenty-four concerts at Boardwalk Hall, as well as numerous other concerts in New Jersey, where "more than 5% of tickets" were withheld from sale to the public.[20]  In contrast with a less restrictive world in which 95% or more of the tickets were sold directly to the public, it is my opinion to a reasonable degree of economic certainty that the current system resulted in (a) higher prices for the tickets that

---

[16] Drayer, Rascher, and McEvoy (2012), p. 456.

[17] Drayer, J. (2011). Making a case for the integration of the primary and secondary ticket markets for professional team sports in the United States. *International Journal of Sports Marketing & Sponsorship, 12*(3), pp. 199-208.

[18] Sweeting, A. (2012). Dynamic pricing behavior in perishable goods markets: evidence from secondary markets for Major League Baseball tickets. *Journal of Political Economy, 120*(6), p. 1146.

[19] Geng, X., Wu, R., and Whinston, A.B. (2006). Profiting from partial allowance of ticket resale. *International Industrial Organization Conference, 2006*, Paper ID 523 at editorialexpress.com.

[20] For example, see paragraphs 58, 61, 65, and 69 of *Complaint and Jury Demand* (*Steven Glickman and Andrew Kimmel v. Live Nation Entertainment, Inc. et al.*).

did make it to the public in the secondary market, and (b) fewer tickets being available for the general public.  In other words, the current system of excluding more than 5% of concert tickets from sale to the general public results in fewer tickets being available to the general public (in both the primary and the secondary markets) and for tickets available in the secondary market to sell at higher prices.

17.     Based on this finding, it is my opinion to a reasonable degree of economic certainty that the current system results in higher prices for resold tickets than would a system in which supply and demand were better matched up initially and in which any mismatches were resolved by individual bilateral transactions (fan to fan) rather than promotor to broker to fan.

18.     Markets with a higher concentration of sellers typically result in higher prices in those markets.   Many studies have been done analyzing the relationship between concentration and price, and "these studies all show strong evidence of a positive relationship between concentration and the level of price."[21] This same general result, that increased seller concentration results in higher prices, has been shown to apply for ticket resale as well.   Elfenbein (2006) found that states with higher concentrations of ticket resellers experienced higher prices.[22]   Moreover, the New York Attorney General released a recent study of concert tickets, showing that brokers dealing in larger quantities are able to charge higher prices than those dealing in lesser quantities.[23]   This matters because when the general public resells tickets that it does not want to use, these individuals can transact

---

[21] Waldman, D.E., and Jensen, E.J. (1998).  *Industrial Organization: Theory and Practice*.  Addison-Wesley. P. 454.

[22] Elfenbein, D.W. (2006). Do anti-ticket scalping laws make a difference online? Evidence from internet sales of NFL tickets. *Social Science Research Network*, Abstract ID 595682, pp. 0, 24.  Elfenbein finds that states with more regulations of the secondary market have fewer resellers, higher concentrations of resellers, and high prices.

[23] A repeated finding of the report is that some brokers use automated bots, computer programs that can purchase hundreds of tickets in seconds. The report states that "Our analysis…reveals that the brokers that commanded the greatest markups in the ticket resale market were those that used Ticket Bots." See Office of New York State Attorney General Eric T. Schneiderman (2016), "Obstructed View: What's blocking New Yorkers from getting tickets," p. 26, at on.ny.gov/20vdr9p.

directly through a modern, on-line ticketing platform where the buyer is another member of the general public (which is an important technological change from earlier forms of ticket resale). However, when held-back tickets are resold through a broker (either because the recipients of the tickets are not supposed to sell the ticket, either at all or above face value,[24] or it might bring negative unwanted publicity to the person[25]) who then uses various ticketing resale platforms to sell the ticket. Thus, there is an additional layer in the supply chain prior to the ticket making into the secondary market that is available to the public. If that additional layer were provided competitively, the effect on price might be small, but in this market the intermediaries are highly concentrated (as discussed above).[26] Thus, imposing an additional layer in the supply chain creates a problem known as "double marginalization," which results in higher prices to customers.[27]

19.     Second, and relatedly, consumer sellers often sell tickets for lower prices than professional brokers for various reasons. The simplest explanation is the one provided above: individual fans have no market power and thus tend to see their price driven down towards their marginal costs. As noted in a comprehensive study for the Department of Culture, Media, and Sport of the United Kingdom (covering sporting and music events and thousands of participants in those markets):

> It should be noted that, for a professional broker, these consumer sellers are spoilers of the market. To stay in business a professional reseller has got to sell above his purchase price. A consumer seller is not so constrained. For them, the price paid for a ticket once bought is essentially a bygone. In the end he will either use the ticket or sell it for whatever he can get for it. They have effectively no overheads and no

---

[24] Tom Ley (2015), "How players manage to scalp their Super Bowl tickets," Deadspin, Feb. 10, at bit.ly/1RJ5kza.

[25] ESPN (2005), "Tice expects 'big fine' for actions," ESPN, Mar. 10, at es.pn/1ROnqWI.

[26] The federal antitrust authorities define "highly concentrated" markets as those with a Hirschman-Herfindahl Index (HHI) of 2,500 or higher. See Horizontal Merger Guidelines of the U.S. Department of Justice and the Federal Trade Commission (http://1.usa.gov/21jA9Tt). With 34.4% share, PrimeSport's contribution to HHI exceeds 2,500.

[27] See Waldman, D.E., and Jensen, E.J. (1998). *Industrial Organization: Theory and Practice*. Addison-Wesley. Pp. 406-409.

advertising costs. They have no future activity to protect. **As such they tend to drive down the prices on the secondary market.**[28]

20.     While the question of whether the amount of withheld tickets affects secondary market quantity and prices is a very narrow and specific question, the aforementioned UK study found that <u>whenever</u> tickets are withheld for an event, higher prices tend to ensue on the secondary market.  Specifically:

> It will already be apparent that the way in which primary selling is managed is of direct importance to the way in which the re-sale market is established and developed. Fundamentally, given a popular event with excess demand, **the policies of the primary seller with respect to pricing, allocation and control of re-sale will largely determine volume and pricing in the secondary market**.

> Primary sellers are not necessarily transparent in their disposition of tickets. In many cases the majority of primary market tickets do not change hands at the box office but are allocated to season ticket holders, corporate hospitality events, fan clubs, organisers, agents, players and producers. It has been known for a major event to be sold out within 90 seconds of the opening of the box office.

> **These practices <u>necessarily</u> restrict supply and thus increase the opportunities for enhanced premia on re-sale**.[29]

21.     Similarly, when economists Alan Krueger and Marie Connolly Pray surveyed fans at 30 concerts in the U.S., they found that "reselling is much more common for shows that sell a higher proportion of tickets in the primary market."[30]  That is, increasing primary sales to the public increases secondary supply, and then the law of demand kicks in to turn increased supply into lower prices.

22.     Third, making 95% or more of tickets available to the general public in the but-for world would have satisfied more of the actual demand for concert tickets than in the actual world where more than 5% have been withheld.  Satisfying more demand through the

---

[28] Europe Economics. (2009). Analysis of the secondary sales market for tickets for sporting, cultural and other events. Published Sep. 14, 2009, p. 24, at bit.ly/1MrSOCc.  Emphasis added.

[29] Europe Economics (2009), p. 21.  Emphasis added.

[30] Krueger, A. B. and Pray, M. C. (2008). Evidence on the secondary market for concert tickets. *Research Gate*, Publication No. 228862794, p. 1.

primary market lowers excess demand in the secondary market; thus it is my opinion to a reasonable degree of economic certainty that making 95% of tickets available to the general public would drive down ticket prices, all else equal.

23.     Thus, withholding tickets causes higher prices to be paid by the general public.

24.     Based upon the foregoing, Mr. Glickman and Mr. Kimmel purchased tickets for the Phish and Maroon 5 events, respectively, in a secondary market in which prices were higher than they would have been had AEG made 95% of all tickets available for sale to the general public.

## 4.    SIGNATURE

25.     I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 18th day of April, 2016, at Emeryville, California.

Daniel A. Rascher

Appendix A

## DANIEL A. RASCHER, PH.D.

### EDUCATION

B.A., Economics, University of California at San Diego.

Ph.D., Economics, University of California at Berkeley.
Dissertation Title, *Organization and Outcomes: A Study of the Sports Industry*

Certified Valuation Analyst (CVA) by the National Association of Certified Valuators and Analysts

### PRESENT POSITIONS

University of San Francisco
<u>Director of Academic Programs for the Sport Management Program</u>, 2002-current

<u>Professor of Sport Management</u>, 2010-current

<u>Associate Professor of Sport Management</u>, 2005-2010

<u>Assistant Professor of Sport Management</u>, 2000-2005

<u>Adjunct Professor of Sport Management</u>, 1999-2000

- M.A. Course – Economics and Finance for Sport Management
- M.A. Course – Master's Project in Sport Management
- M.A. Course – Sport Business Research Methods

Institute of Sports Law and Ethics (Santa Clara University).  Board Member, 2011-current

SportsEconomics, LLC (www.sportseconomics.com)
<u>Founder and President</u>, 1998-current

Performed economic analysis for sports industry clients including multiple projects involving the NFL, NBA, NASCAR, NCAA, NHRA, NHL, MLS, AHL, professional cycling, media companies, sports commissions and government agencies, event management, B2B enterprises, and IHRSA.  Specialized in industrial organization, antitrust, valuations, market research, labor issues, financial modeling, strategy, economic impact, and feasibility research.

OSKR, LLC (www.oskr.com)
<u>Co-Founder and Partner</u>, 2008-current

Performed economic analysis for clients involved in sports and other industries, including insurance, technology, and consumer products.

### PREVIOUS ACADEMIC EXPERIENCE

NORTHWESTERN UNIVERSITY
Adjunct Professor, Winter 2014

NEW YORK UNIVERSITY (NYU)
Faculty-in-Residence Program, Fall 2013

IE BUSINESS SCHOOL (Madrid, Spain), Visiting Professor, 2010-2013

UNIVERSITY OF MASSACHUSETTS AT AMHERST, Sport Management Department
<u>Assistant Professor</u>, 1997-1998

* M.S. Courses—Principles of Sport Business Management, Applied Sport Business Management

* B.S. Courses—Sport Business Finance, Sports Economics

UNIVERSITY OF CALIFORNIA AT BERKELEY, Department of Economics
Teaching Assistant

* Economic Principles & Intermediate Microeconomics.


## PREVIOUS CONSULTING EXPERIENCE

LECG, LLC
Affiliate, 2003-2007; Principal, 2000-2003; Senior Economist, 1998-2000

* Performed economic analysis for sports industry clients including multiple projects involving the NFL, MLB, NBA, NHL, PGA, Formula One racing, CART, and Premier League Football (soccer).  Specialized in industrial organization, antitrust, M&As, valuations, and damages analysis.

* Provided testimony for cases involving sports industry clients, including damages analysis and liability.

* 40% of work is related to antitrust litigation, 20% is IP and breach of contract damages litigation, 20% is merger related, and 20% is management consulting.

* 60% of work involves the sports and entertainment industries, 15% involves technology, and 25% is in other industries including agriculture, transportation, and energy.

UNIVERSITY OF CALIFORNIA AT BERKELEY, Competitive Semiconductor Manufacturing Program
Visiting Scholar, Institute of Industrial Relations, 1998-2000

Research Fellow, 1995-1997

* Funded by the Alfred P. Sloan Foundation, the CSM study is an interdisciplinary project that analyzes the determinants of high performance in semiconductor manufacturing.

* Research on HR, training, small sample analyses and generalizability of case study results.

NATIONAL ECONOMIC RESEARCH ASSOCIATES, Summer 1994; January-August 1995
Research Assistant

* Research on the energy industry, on transmission pricing, and on the economic damages of contract breaches.

QUANTUM CONSULTING, 1992-1994
Research Assistant

* Developed a model and a software package using spline techniques to weather-normalize energy usage, allowing the PUC to evaluate regulation policies.


## HONORS AND AWARDS

Research Fellow of the North American Society for Sport Management, 2009.

College of Arts & Sciences Collective Achievement Award, 2009

Innovation Award Winner (for the innovative use of technology in teaching), 2004.  From the *Center for Instruction and Technology*, University of San Francisco.

Alfred P. Sloan Foundation Research Grant for the Study of Human Resource Systems, 1995-1997.

Newton-Booth Fellowship for graduate study at University of California at Berkeley, 1990-1991.

## PEER-REVIEWED JOURNAL ARTICLES

"A Smaller Window to the University: The Impact of Athletic De-Escalation on Status and Reputation," with Michael Hutchinson.  In *Journal of Intercollegiate Sport* (forthcoming).

"The Demand for College Football Bowl Games," with Terence Eddy.  In *International Journal of Sport Finance*, Vol. 11, No. 2, February 2016.

"If We Build It, Will They Come?: Examining the Effect of Expansion Teams and Soccer-Specific Stadiums on Major League Soccer Attendance," with Steve Shapiro and Tim DeSchriver.  In *Sport, Business, and Management: An International Journal,* Vol. 6, No. 2, Spring 2016.

"An Explanation of Economic Impact: Why Positive Impacts Can Exist for Smaller Sports," with Nola Agha.  In *Sport, Business, and Management: An International Journal,* Vol. 6, No. 2, Spring 2016.

"Tracking the Dollars: How Economic Impact Studies can Actually Benefit Managerial Decision Making," with Michael Goldman.  In *Sport & Entertainment Review,* Vol 1, No. 1, February 2015.

"Sport Pricing Research: Past, Present, and Future," with Joris Drayer.  In *Sport Marketing Quarterly*, Vol. 22, No. 3, September 2013.

"The Antitrust Implications of "Paperless Ticketing" on Secondary Markets," with Andrew D. Schwarz.  In *Journal of Competition Law and Economics*, Vol. 9, No. 3, 2013.

"An Examination of Underlying Consumer Demand and Sport Pricing Using Secondary Market Data" with Joris Drayer and Chad McEvoy.  In *Sport Management Review*, Vol. 15, No. 4, November 2012.

"Financial Risk Management:  The Role of a New Stadium in Minimizing the Variation in Franchise Revenues" with Matt Brown, Mark Nagel, and Chad McEvoy.  In *Journal of Sports Economics*, Vol. 13, No. 3, August 2012.

"Factors Affecting the Price of Luxury Suites in Major North American Sports Facilities" with Tim DeSchriver and Steve Shapiro.  In *Journal of Sport Management,* Vol. 26, No. 3, May 2012.

"Free Ride, Take it Easy: An Empirical Analysis of Adverse Incentives Caused by Revenue Sharing" with Matthew Brown, Mark Nagel, and Chad McEvoy.  In *Journal of Sport Management,* Vol. 25, No. 5, September 2011.

"Simulation in Sport Finance," with Joris Drayer.  *Simulation & Gaming: An Interdisciplinary Journal of Theory, Practice, and Research* Vol. 41, No. 2, April 2010.

"Where did National Hockey League Fans go During the 2004-2005 Lockout?: An Analysis of Economic Competition Between Leagues," with Matthew Brown, Mark Nagel, and Chad McEvoy. In *International Journal of Sport Management and Marketing*, Vol. 5, Nos. 1, 2, January 2009.

"The Effects of Roster Turnover on Demand in the National Basketball Association," with Steve Shapiro, Alan Morse, and Chad McEvoy.  In *International Journal of Sport Finance*, Vol. 3, No. 1, February 2008.

"Variable Ticket Pricing in Major League Baseball" with Chad McEvoy, Mark Nagel, and Matthew Brown.  In *Journal of Sport Management*, Vol. 21, No. 3, July 2007.

"Do Fans Want Close Contests?: A Test of the Uncertainty of Outcome Hypothesis in the National Basketball Association" with John Paul Solmes.  In *International Journal of Sport Finance*, Vol. 3, No. 2, August 2007.

"The Use of Simulation Technology in Sport Finance Courses: The Case of the Oakland A's Baseball Business Simulator" with Joris Drayer.  In *Sport Management Education Journal* Vol. 1, No. 1, May 2007.

"Washington "Redskins" – Disparaging Term or Valuable Tradition?: Legal and Economic Issues Concerning *Harjo v. Pro-Football, Inc.*" with Mark Nagel.  In *Fordham Intellectual Property, Media, and Entertainment Law Journal*, Vol. XVII, No. 3, Spring 2007.

"Treatment of Travel Expenses by Golf Course Patrons: Sunk or Bundled Costs and the First and Third Laws of Demand," with Matthew Brown, Chad McEvoy, and Mark Nagel.  In *International Journal of Sport Finance*, Vol. 2, No. 1, February 2007.

"Major League Baseball Anti-Trust Immunity: Examining the Legal and Financial Implications of Relocation Rules" with Mark Nagel, Matthew Brown, and Chad McEvoy.  In *Entertainment and Sports Law Journal,* Vol. 4, No. 3, December 2006.

"The Use of Public Funds for Private Benefit: An Examination of the Relationship between Public Stadium Funding and Ticket Prices in the National Football League" with Matthew Brown and Wesley Ward.  In *International Journal of Sport Finance*, Vol. 1, No. 2, June 2006.

"An Analysis of Expansion and Relocation Sites for Major League Soccer" with Matthew Baehr, Jason Wolfe, and Steven Frohwerk.  In *International Journal of Sport Management,* Vol. 7, No. 1, January 2006.

"Revenue and Wealth Maximization in the National Football League: The Impact of Stadia" with Matthew Brown, Mark Nagel, and Chad McEvoy.  In *Sport Marketing Quarterly*, Vol. 13, No. 4, December 2004.

"NBA Expansion and Relocation: A Viability Study of Various Cities" with Heather Rascher.  In *Journal of Sport Management*, Vol. 18, No. 3, July 2004.

"Does Bat Day Make Cents?: The Effect of Promotions on the Demand for Baseball," with Mark McDonald.  In *Journal of Sport Management*, Vol. 14, No. 1, January 2000.

"The NBA, Exit Discrimination, and Career Earnings," with Ha Hoang.  In *Industrial Relations*, Vol. 38, No. 1, January 1999.

**BOOKS**

"Financial Management in the Sport Industry" 2nd ed. with Matthew Brown and Mark Nagel. Holcomb Hathaway, Inc., 2015.  A textbook.

"Financial Management in the Sport Industry" with Matthew Brown and Mark Nagel.  Holcomb Hathaway, Inc., June 2010.  A textbook.

## BOOK CHAPTERS

"Illustrations of Price Discrimination in Baseball" with Andrew D. Schwarz in L. Kahane and S. Shmanske eds., *Economics Through Sports*, Oxford: Oxford University Press, (2012).

"The Expanding Global Consumer Market for American Sports: The World Baseball Classic" with Mark Nagel, Chad McEvoy, and Matt Brown in G. Mildner, and C. Santo, eds., *Sport and Public Policy*, Champaign, IL: Human Kinetics, 2010.

"Franchise Relocations, Expansions, and Mergers in Professional Sports Leagues." In B. Humphreys, and D. Howard, eds., *The Business of Sports*, pp. 67-106.  Westport, CT: Praeger, 2008.

"Collective Bargaining in Sport" with M. Nagel, M. Brown, and C. McEvoy.  In *Encyclopedia of World Sport*, pp.335-339. Great Barrington, MA: Berkshire Publishing, 2005.

"The Role of Stadia in the USA: Wealth Maximization in the National Football League" with Matthew Brown and Mark Nagel in G. Trosien & M. Dinkel (eds.), *Grenzen Des Sportkonsums* (Frontiers of Sport Commerce), Heidelberg, Germany: SRH Learnlife AG, 2003.

"A Test of the Optimal Positive Production Network Externality in Major League Baseball," in E. Gustafson and L. Hadley, eds., *Sports Economics: Current Research*, 1999.  Praeger Press.

"A Model of a Professional Sports League," in W. Hendricks (ed.), *Advances in the Economics of Sport*, vol. 2. June 1997, JAI Press, Inc.

## BOOK REVIEWS

"Review of: Much More Than a Game: Players, Owners, and American Baseball Since 1921", by Robert F. Burk in *Journal of Economic Literature*, Vol. 40(3), September 2002, pp. 949-951.

## NON-PEER REVIEWED ARTICLES

"Rich Men's Toys – Applying Valuation Methods to the Business of Professional Sports" in *Valuation Strategies*, March/April 2015.

"Competitive Balance in Sports: "Peculiar Economics" Over the Last Quarter Century," with Andrew. D. Schwarz.  In *Entertainment, Arts, and Sports Law Journal*, 24(1), Spring 2013.

"The Impact on Demand from Winning in College Football and Basketball: Are College Athletes More Valuable than Professional Athletes?" with Chad McEvoy.  In *Selected Proceedings of the Santa Clara University Sports Law Symposium*, September 2012.

"Smooth Operators: Recent Collective Bargaining in Major League Baseball" with Tim DeSchriver, 2012.  In *International Journal of Sport Finance*, 7(2).

"The Economics of Competitive Balance on the Field and in the Courts" in *Selected Proceedings of the Santa Clara University Sports Law Symposium*, 2011.

"5 Themes from 50 Economic Impact Studies" in *SportsEconomics Perspectives*, Issue 5, 2010.

"What is the Value of Control of a Sports Enterprise?: Controlling Interest Premiums in Sports Valuations" in *SportsEconomics Perspectives*, Issue 4, April 2008.

"Executive Interview: Charlie Faas, Executive Vice President and CFO of Silicon Valley Sports and Entertainment." in *International Journal of Sport Finance*, Vol. 2, No. 2, June 2007.

"Executive Interview: Dan Champeau, Managing Director, and Chad Lewis, Analyst with Fitch." in *International Journal of Sport Finance*, Vol. 2, No. 1, February 2007.

"Executive Interview: Dennis Wilcox, Principal with Climaco, Lefkowitz, Peca, Wilcox & Garofoli Co., L.P.A." in *International Journal of Sport Finance*, Vol. 1, No. 4, November 2006.

"Executive Interview: Randy Vataha, Founder of Game Plan, LLC" with Dennis Howard in *International Journal of Sport Finance*, Vol. 1, No. 2, June 2006.

"Executive Interview: Mitchell H. Ziets, President and CEO of MZ Sports, LLC" in *International Journal of Sport Finance*, Vol. 1, No. 1, February 2006.

"The Oakland Baseball Simworld: Enabling Students to Simulate the Management of a Baseball Organization" in *Journal of Sports Economics*, Vol. 6, No. 3, August 2005.

"Examining the Viability of Various Cities for NBA Expansion or Relocation" with Heather Rascher in *SportsEconomics Perspectives*, Issue 2, April 2002.

"Following a Dollar: the economic impact of a sports event is greater than the sum of its parts" by Nola Agha in *SportsTravel Magazine*, Vol. 6, No. 10, November/December 2002.  Heather Rascher and Daniel Rascher contributed to the article.

"Real Impact: understanding the basics of economic impact generated by sports events" in *SportsTravel Magazine*, Vol. 6, No. 7, July/August 2002.  Reprinted in four regional sports commission newsletters.

"What is the Size of the Sports Industry?," in *SportsEconomics Perspectives*, Issue 1, August 2001.

"Neither Reasonable nor Necessary: "Amateurism" in Big-Time College Sports", with Andrew D. Schwarz.  In *Antitrust* (Spring 2000 Special Sports Issue).

"What Brings Fans to the Ballpark?," with Nola Agha in *FoxSportsBiz.com*, Spring 2000.

**RE-PUBLICATIONS**

Republication of "Do Fans Want Close Contests? A Test of the Uncertainty of Outcome Hypothesis in the National Basketball Association", with John Paul G. Solmes in *Recent Developments in the Economics of Sport*, ed. Wladimir Andreff; *The International Library of Critical Writings in Economics*, 2011, Elgar Pub., United Kingdom.

Republication of "What Brings Fans to the Ballpark?," with Nola Agha in *Brilliant Results* 2005.

Republication of "What is the Size of the Sports Industry?," in *Brilliant Results* 2005.

Republication of "Neither Reasonable nor Necessary: "Amateurism" in Big-Time College Sports", with Andrew D. Schwarz in *The Economics of Sport, Vol. I*, ed. Andrew Zimbalist; *The International Library of Critical Writings in Economics* 135, 2001, Elgar, Northampton, MA.

## PEER-REVIEWED JOURNAL ARTICLES UNDER REVIEW

"The Beckham Effect: A Longitudinal Investigation of David Beckham's Impact on Major League Soccer, 2007-2012," with Steve Shapiro and Tim DeSchriver.  2014.  Submitted to *Journal of Sport Management*.

"What Drives Endorsement Values for Superstar Athletes?" with Terence Eddy and Giseob Hyun. 2014.  Submitted to *Journal of Advertising Research*.

## MONOGRAPHS

"The Effect of Human Resource Systems on Fab Performance," with Clair Brown, in C. Brown (ed.), *The Competitive Semiconductor Manufacturing Human Resources Project:  Final Report*, 1997.

"Inter-industry Comparisons: Lessons from the Semiconductor Industry," with Rene Kamita, in C. Brown (ed.), *The Competitive Semiconductor Manufacturing Human Resources Project:  Final Report*, 1997.

"Problem-Solving Structures; A Case Study of Two U.S. Semiconductor Fabs," in C. Brown (ed.), *The Competitive Semiconductor Manufacturing Human Resources Project:  Final Report*, 1997.

"Transferability of Case Study Research:  An Example from the Semiconductor Industry," with Clair Brown, in C. Brown (ed.), *The Competitive Semiconductor Manufacturing Human Resources Project:  2nd Interim Report*, 1996.

"Headcount and Turnover," in C. Brown (ed.), *The Competitive Semiconductor Manufacturing Human Resources Project:  2nd Interim Report*, 1996.

"Training," with Jumbi Edulbehram in C. Brown (ed.), *The Competitive Semiconductor Manufacturing Human Resources Project:  2nd Interim Report*, 1996.

## WORKING PAPERS

"An Analysis of National Collegiate Athletic Association (NCAA) Football Enforcement Actions from 1990-2011," with Nicholas Fulton, Mark Nagel, and Richard Southall.  2012.

"The Practical Use of Variable Ticket Pricing in Major League Baseball" with Chad McEvoy, Matt Brown, and Mark Nagel.  2012.

"Will the Oakland A's Relocation to San Jose Harm the Sharks – A Case Study of Competition Across Professional Sports Teams" with Chad McEvoy, Matt Brown, and Mark Nagel.  2011.

"Counting Local Residents in Economic Impact Analysis: New Findings from Sporting Events" with Richard Irwin.  2008.

"Perverse Incentives with the NCAA Basketball Tournament Seeding Process" with Matthew Brown, Chad McEvoy, and Mark Nagel.  2006.

"Do the Giants Compete with the A's: The Degree of Competition Between Teams" with Matthew Brown, Chad McEvoy and Mark Nagel.  2006.

"Forecasting Model of Airport Economic Impacts" with Alan Rozzi and Christopher Gillis.  2004.

"Psychic Impact of Professional Sports: A Case Study of a City Without Major Professional Sports" with Matthew Brown, Mark Nagel, and Chad McEvoy.  2003.

"The Use of New Technology and Human Resource Systems in Improving Semiconductor Manufacturing Performance", with Clair Brown and Greg Pinnsoneault, Working Paper, University of California at Berkeley, 1999.

## INVITED SPEAKING ENGAGEMENTS

"The Business of Intercollegiate Sports," presented in the sport management department's sport law course, University of Toronto, 2016.

"Economics of Sports."  Lectures at the Oregon Law Summer Sports Institute, University of Oregon, 2015.

"The Business of Intercollegiate Sports" presented in the sport management masters program, University of Arkansas, 2015.

Panelist on "The Future of Intercollegiate Athletics: The Players' Perspective," at the Sports Law and Business Conference at Arizona State University, 2015.

Panelist on "Intersection of Business and Sports Law," at the Sports and Entertainment Law Forum, presented by the University of Oregon Law School, 2015.

"The Economics of College Athletics Departments" presented in the masters in collegiate athletics program, college athletics in a digital era course, University of San Francisco, 2015.

"The Business of Intercollegiate Sports," presented in the sport management department's sport law course, University of Toronto, 2014.

"Economics of Sports."  Lectures at the Oregon Law Summer Sports Institute, University of Oregon, 2014.

"The Finances of College Sports," presented in Matthew Brown's sport finance course, Ohio University, 2014.

"Antitrust Economics and Sports," presented in Professor Robert Elias's Politics and Sport course, University of San Francisco, 2014.

8

"The Economics of the Sports Industry," presented to the Haas School of Business, U.C. Berkeley, 2014.

"Economic Impact in Sports." Presentation in the masters in sports business program at New York University (NYU).  2013.

"Pricing the Game Experience," with Stephen Shapiro and Tim DeSchriver.  Invited research presentation at *Sport Entertainment & Venues Tomorrow* conference, 2013, University of South Carolina.

"Academia and the Industry: Opportunities for Meaningful Research Collaboration."  Invited panelist at *Sport Entertainment & Venues Tomorrow* conference, 2013, University of South Carolina.

"Sports Sponsorships in 2013," Panelist at Court Vision (Sheppard Mullin Sports Law Speaker Series and SLA).  Continuing Legal Education (CLE) units program.  2013.

"Using Contract Law to Tackle the Coaching Carousel – Commentary."  Presented at University of San Francisco, *Sports & Entertainment Law Association*, 2013.

"Sports Economics, Analytics, and Decision Making: 8 Examples." Invited speaker at the *IEG Sports Analytics Innovation Summit*, 2012

" 'Paperless Ticketing' and its Impact on the Secondary Market: An Economic Analysis with Antitrust Implications" with Andy Schwarz.  Presented at U.C. Berkeley, Boalt Law School's *Sports and Entertainment Law Society*, 2011.

"Financial Valuation of Sports Assets," presented at the *Sport Management Today Video Conference Series* at the IE Business School, 2011

"Financial Valuation of Sports Assets," presented to the *Sport Management Department* at the University of Northern Denmark, 2011.

"Economic Impact in Sports," presented to the *Sport Management Department* at the University of Northern Denmark, 2011.

"The Economics of the Sports Industry," presented to the *Sports Business Association* at U.C. Irvine, 2011.

"Is Free Riding a Problem in Sports Leagues?: Adverse Incentives Caused by Revenue Sharing" with Mark Nagel, Chad McEvoy, and Matt Brown.  Presented at the *Economics Lecture Series* at Sonoma State University Business School, April 2010.

"Economics for Antitrust Lawyers: Application to Class Certification" presented to Lieff Cabraser Heimann & Bernstein for Continuing Legal Education (CLE) units.  November 2009.

"Economics for Antitrust Lawyers: Market Structure and Economic Modeling" presented to Lieff Cabraser Heimann & Bernstein for Continuing Legal Education (CLE) units.  October 2009.

"Sports Stadium Financing in Today's Economy" presented to the Rotary Club of San Jose, May 2009.

"The Economic Impact of Liberty Bowl Memorial Stadium," presented at the University of Memphis, *Issues in College Sports* lecture series (invited panelist), March 2007.

"The Economics of the Sports Industry," presented to the MBA Program at the Haas School of Business, U.C. Berkeley, January 2007.

"Stadium Financing – Dallas Cowboys Case," presented to the MBA Program at the Graduate School of Business, Stanford University, 2006.

"Taking the Gown to Town: Research and Consulting for the Sport Industry."  Invited presentation at the Past President's Workshop, *North American Society for Sport Management*, June 2006.

"Various Topics in Sports Economics," presented at the Wednesday Workshop on Economics Research, California State University, East Bay, 2005.

"Stadium Financing – Dallas Cowboys Case," presented to the MBA Program at the Graduate School of Business, Stanford University, 2005.

"The Economics of the Sports Industry," presented to the MBA Program at the Haas School of Business, U.C. Berkeley, 2005.

"The Economic Impact of General Aviation Airports: An Econometric Model," presented at Niche Ventures Spring Meeting, 2004.

"The Economics of the Sports Industry," presented to the MBA Program at the Haas School of Business, U.C. Berkeley, 2004.

"Oral Testimony Regarding California State Senate Bill 193, Student Athletes' Bill of Rights". 2003.  Testimony to the California State Senate Subcommittee on Entertainment.

"The Economics of the Sports Industry," presented to the MBA Program at the Haas School of Business, U.C. Berkeley, 2003.

"The Use of New Technology and Human Resource Systems in Improving Semiconductor Manufacturing Performance," with Clair Brown and Greg Pinsonneault.  Presented at *The Wharton School*, University of Pennsylvania, 1999.

CONFERENCE PRESENTATIONS

"Cartel Behavior in United States College Sports: An Analysis of National Collegiate Athletic Association Football Enforcement Actions from 1990 to 2011," with Mark Nagel, Richard Southall, and Nick Fulton.  Presented at *Western Economics Association International*, January 2016.

"The College Basketball Players' Labor Market: *Ex Ante* versus *Ex Post* Valuations" with David Berri and Robert Brown.  Presented at *Western Economics Association International*, July 2015.

"What drives Endorsement Values for Superstar Athletes?" with Terry Eddy and Giseob Hyun. Presented at *Sport Management Association of Australia and New Zealand*, November 2014.

"The Beckham Effect: David Beckham's Impact on Major League Soccer, 2007-2012," with Stephen Shapiro and Tim DeSchriver.  Presented at *North American Society for Sport Management*, May 2014.

"Where is Everyone? An Examination of Consumer Demand for College Football Bowl Games," with Terry Eddy and Rebecca Stewart.  Presented at *Collegiate Sports Research Institute* conference, April 2014.

"If We Build It, Will You Come?: Examining the Effect of Expansion Teams and Soccer-Specific Stadiums on Major League Soccer Attendance," with Stephen Shapiro and Tim DeSchriver. Presented at *North American Society for Sport Management*, May 2013.

"Should San Jose say 'No Way' to the Oakland A's," with Mark Nagel and Matt Brown.  Presented at *North American Society for Sport Management*, May 2013.

Panel member for "Financial Issues in Intercollegiate Sports." Presented at the *Santa Clara University Sports Law Symposium*, 2012.

"What's in a Name?: Does the Amount and Source of Public Financing Impact Team Names?" with Nola Agha and Matt Brown.  Presented at *Western Economics Association International*, July 2012.

"When Can Economic Impact be Positive?  Twelve conditions that explain why smaller sports have bigger impacts" with Nola Agha.  Presented at *Western Economics Association International*, July 2012.

"Reflections on the MLB Collective Bargaining Agreement."  Part of a symposium on the Economics of Labor-Management Relations in Sports Today at *Western Economics Association International*, July 2012.

"The Economics of Competitive Balance on the Field and in the Courts." Presented at the *Santa Clara University Sports Law Symposium*, 2011.

" 'Paperless Ticketing' and its Impact on the Secondary Market: An Economic Analysis with Antitrust Implications" with Andy Schwarz.  Presented at *International Association of Venue Managers*, July 2011.

" 'Paperless Ticketing' and its Impact on the Secondary Market: An Economic Analysis with Antitrust Implications" with Andy Schwarz.  Presented at *TicketSummit*, July 2011.

" 'Paperless Ticketing' and its Impact on the Secondary Market: An Economic Analysis with Antitrust Implications" with Andy Schwarz.  Presented at *Western Economics Association International*, July 2011.

"Financial Risk Management: The Role of a New Stadium in Minimizing the Variation in Franchise Revenues" with Matt Brown, Chad McEvoy, and Mark Nagel.  Presented at *Western Economics Association International*, July 2011.

"A Panel Study of Factors Affecting Attendance at Major League Soccer Contests: 2007-2010" with Tim DeSchriver.  Presented at the *Sport Marketing Association IX* conference in New Orleans, October 2010.

"The NCAA and the Prisoner's Dilemma".  Presented at the *Sports Law Symposium* at the University of Santa Clara Law School, September 2010.

"Financial Risk Management: The Role of a New Stadium in Minimizing the Variation in Franchise Revenues" with Matt Brown, Chad McEvoy, and Mark Nagel.  Presented at *North American Society for Sport Management*, May 2010.

"An Analysis of the Value of Intercollegiate Athletics to its University: Methods".  Presented at the *Scholarly Conference on College Sport*, April 2010.

"Demand, Consumer Surplus, and Pricing Inefficiency in the NFL: A Case Study of the Secondary Ticket Market Using StubHub" with Joris Drayer and Chad McEvoy.  Presented at *North American Society for Sport Management*, May 2009.

"Luxury Suite Pricing in North American Sports Facilities" with Tim DeSchriver.  Presented at *North American Society for Sport Management*, May 2009.

"A Smorgasbord of Lessons Learned from Economic Impact Studies"  Presented at *North American Society for Sport Management*, June 2008.

"Globalization and Sport Finance: What is True and What is Myth?" with Mark Nagel and Ross Booth.  Presented at the *Sport Management Association of Australia and New Zealand*, November 2007.

"Exploring the Myth that a Better Seed in the NCAA Men's Basketball Tournament results in an *ex ante* Higher Payout" with Mark Nagel, Matt Brown, and Chad McEvoy.  Presented at the *Sport Management Association of Australia and New Zealand*, November 2007.

"Oakland A's Baseball Simulator" with Joris Drayer.  Presented at *North American Society for Sport Management*, June 2007.

"Teaching Sport Financial Management: A Symposium" with Timothy DeSchriver, Matthew Brown, and Michael Mondello.  Presented at *North American Society for Sport Management*, June 2007.

"The Economics of the Sports Industry," presented to the MBA Program at the Haas School of Business, U.C. Berkeley, January 2007.

"Practical Strategies for Variable Ticket Pricing in Professional Sports" with Chad McEvoy, Matt Brown, and Mark Nagel.  Presented at *Sport Marketing Association IV*, November 2006.

"Do the Giants Compete with the A's: The Degree of Competition Between Teams", presented at *Western Economic Association International*, July 2006.

"Do the Giants Compete with the A's: The Degree of Competition Between Teams", presented at *North American Society for Sport Management*, June 2006.

"Measuring Sponsorship Return on Investment: A Need for Quantitative Analysis" with Matt Brown, Mark Nagel, and Chad McEvoy.  Presented at *Sport Marketing Association III*, November 2005.

"The Use of Economic Impact Analysis for Marketing Purposes" with Dick Irwin and Matt Brown. Presented at *Sport Marketing Association III*, November 2005.

"Is Free Riding a Problem in Sports Leagues?: Adverse Incentives Caused by Revenue Sharing" with Mark Nagel, Chad McEvoy, and Matt Brown.  Presented at *Western Economic Association International*, July 2005.

"Public Funds for Private Benefit: Equity Issues in Sport Stadia Funding and the Question of Who Really Pays," with Matt Brown and Mark Nagel.  Presented at *North American Society for Sport Management*, June 2005.

"Is Free Riding a Problem in Sports Leagues?: Adverse Incentives Caused by Revenue Sharing" with Mark Nagel, Chad McEvoy, and Matt Brown.  Presented at *North American Society for Sport Management*, June 2005.

"Is Free Riding a Problem in Sports Leagues?: Adverse Incentives Caused by Revenue Sharing" with Mark Nagel, Chad McEvoy, and Matt Brown.  Accepted by *Sport Management Association of Australia and New Zealand*, Nov. 2004.

"Redskins: Legal, Financial, and Policy Issues relative to Harjo v. Pro-Football, Inc." with Richard Southall, Matt Brown, and Mark Nagel.  Presented at *North American Society for the Sociology of Sport*, Nov. 2004.

"An Analysis of Distance Traveled and Tourism Economic Impact: A Test of the Alchian-Allen Theorem" with Matt Brown, Mark Nagel, and Chad McEvoy.  Presented at *Sport Marketing Association II* conference, Nov. 2004.

"Is Free Riding a Problem in Sports Leagues?: Adverse Incentives Caused by Revenue Sharing" with Mark Nagel, Chad McEvoy, and Matt Brown.  Presented at *Sport Marketing Association II* conference, Nov. 2004.

"Beyond The Economic Impact Study: Examining Economic Impact Data for Support of the Third Law of Demand" with Matthew Brown, Mark Nagel, and Chad McEvoy.  Presented at *North American Society for Sport Management*, 2004.

"Optimal Variable Ticket Pricing in Major League Baseball" with Mark Nagel, Chad McEvoy, and Matthew Brown.  Presented at *North American Society for Sport Management*, 2004.

"*Clarett v. NFL*: Age Eligibility Rules and Antitrust Law in Professional Sports" with Chad McEvoy, Mark Nagel, and Matt Brown.  Presented at *Sport and Recreation Law Association*, 2004.

"Variable Pricing in Baseball: Or, What Economists Would Just Call 'Pricing'," presented at *Western Economic Association International*, 2003.

"The Impact of Stadia on Wealth Maximization in the National Football League: To Build or Renovate?" with Matthew Brown, Mark Nagel, and Chad McEvoy.  Presented at *North American Society for Sport Management*, 2003.

"Major League Baseball's Antitrust Immunity: Examining the Financial Implications of Relocation Rules," with Matthew Brown and Mark Nagel.  Presented at *Society for the Study of the Legal Aspects of Sport and Physical Activity*, 2003.

"Locational Choice in the NBA: An Examination of Potential Cities for Expansion or Relocation," presented at *North American Society for Sport Management*, 2002.

Panel discussant on the effects of the economy on the business of sports at *Sports Facilities and Franchises Forum*, Dallas, TX 2002 (presented by SportsBusiness Journal).

"Psychic Impact Findings in Sports," presented at *Sport Management Association of Australia and New Zealand*, 2001.

"Locational Choice in the NBA: An Examination of Potential Cities for Expansion or Relocation" presented at *Sport Management Association of Australia and New Zealand*, 2001.

"Psychic Impact as a Decision Making Criterion," presented at the *North American Society for Sport Management*, 2000.

"Economic Impact Methods," presented at the *North American Society for Sport Management*, 2000.

"Valuation of Naming Rights," presented at the *Sports Finance Forum*, 2000.

" 'Amateurism' in Big-Time College Sports," presented at the *Western Economic Association International*, 1999.

"Does Bat Day Make Cents?: The Effect of Promotions on the Demand for Baseball," with Mark McDonald.  Presented at the *17th Annual Consumer Psychology Conference*, 1998.

"A Test of the Optimal Positive Production Network Externality in Major League Baseball," presented at the *North American Society for Sport Management Conference*, 1998.

"A Test of the Optimal Positive Production Network Externality in Major League Baseball," presented at the *Western Economic Association International*, 1998.

"The NBA, Exit Discrimination, and Career Earnings," presented at the *Western Economic Association International*, 1997.

"Sports Salary Determination," presented at the *International Atlantic Economic Society Conference*, 1997.

"A Model of a Professional Sports League," presented at the *International Atlantic Economic Society Conference*, 1996.

"Transferability of Case Study Research:  An Example from the Semiconductor Industry," presented at the *American Society of Training and Development Conference*, 1996.

## EDITORIAL BOARDS OF PEER-REVIEWED JOURNALS

*Case Studies in Sport Management,* 2011 – present (founding member)
*International Journal of Sport Finance,* 2006 – present (founding member)
*International Journal of Sport Management and Marketing,* 2011-present
*Journal of Quantitative Analysis in Sports,* 2005 – 2012 (founding member)

*Journal of Sport Management,* 2003 – present
  Associate Editor, 2010 – 2012
*Sport Management Review,* 2001 – 2008

Global Interdisciplinary Business-Economics Advancement Conference, 2014
  Scientific Committee member

## REFEREE FOR PEER-REVIEWED JOURNALS & GRANTING AGENCIES

*American Behavioral Scientist*, 2008
*Case Studies in Sport Management*, 2012, 2014a, 2014b, 2015
*Contemporary Economic Policy*, 2004
*Eastern Economic Journal,* 2010
*Economic Inquiry,* 2008, 2010, 2011
*European Sport Management Quarterly,* 2012
*Industrial Relations*, 1993, 2000, 2000, 2001, 2013
*International Journal of Sport Communication,* 2011
*International Journal of Sport Finance*, 2005, 2006a, 2006b, 2006c, 2007a, 2007b, 2008a, 2008b, 2010, 2011, 2012, 2013, 2014a, 2014b, 2014c, 2015
*International Journal of Sport Management and Marketing*, 2005, 2010, 2013, 2014
*International Journal of Sports Marketing and Sponsorship*, 2016
*International Journal of Sport Policy and Politics,* 2014
*International Review for the Sociology of Sport*, 2012
*Journal of Industrial Economics*, 1997
*Journal of Sport Management,* 2001, 2002, 2003a, 2003b, 2004a, 2004b, 2004c, 2004d, 2004e, 2005a, 2005b, 2005c, 2005d, 2006a, 2006b, 2006c, 2006d, 2006e, 2006f, 2006g, 2006h, 2006i, 2007a, 2007b, 2007c, 2007d, 2008a, 2008b, 2008c, 2008d, 2009a, 2009b, 2009c, 2009d, 2009e, 2009f, 2009g, 2010a, 2010b, 2010c, 2010d, 2011a, 2011b, 2013, 2013b, 2014, 2015a, 2015b, 2016a, 2016b
*Journal of Sports Economics*, 2003, 2007, 2008a, 2008b, 2009, 2010, 2011, 2012a, 2012b, 2014a, 2014b, 2015a, 2015b
*Journal of Venue and Event Management,* 2012
*Journal of the Quantitative Analysis of Sports*, 2005, 2006a, 2006b, 2007
*Perceptual and Motor Skills*, 2009
*Review of Industrial Organization*, 2012, 2013, 2015
*Soccer & Society*, 2014
*Southern Economic Journal*, 2001, 2007a, 2007b
*Sport, Business and Management: An International Journal*, 2011, 2012, 2013
*Sport Management Review*, 2002a, 2002b, 2003a, 2003b, 2003c, 2003d, 2004a, 2004b, 2004c, 2006a, 2006b, 2006c, 2007a, 2007b, 2007c, 2010a, 2010b, 2011, 2015, 2016
*Sport Marketing Quarterly*, 2015

External review of $250,000 grant proposal for the *Social Sciences and Humanities Research Council of Canada*, 2008

## PROFESSIONAL AFFILIATIONS (CURRENT AND PREVIOUS)

American Bar Association
American Economic Association

National Association of Certified Valuation Analysts
North American Society for Sport Management
North American Association of Sports Economists
Sport and Recreation Law Association
Sport Marketing Association
Sports Lawyers Association
Western Economic Association International

**TESTIMONY**

Provided declaration pertaining to the economics of ticketing for sports and entertainment in *Finkelman v. NFL*.  2016.

Provided deposition testimony and submitted two expert reports pertaining to class certification issues in college football in *Rock v. NCAA*.  2014-16.

Submitted an expert report on damages pertaining to an endorsement relationship in *Frank Thomas v. Reebok*.  2015.

Provided deposition testimony and an expert report pertaining to class certification issues in college sports in *In Re: NCAA Athletic GIA Cap Antitrust Litigation*.  2015.

Provided deposition testimony and submitted an expert report pertaining to the economic relationship between two boxing entities in *Garcia v. Top Rank, Inc.*  2015.

Provided trial testimony (and multiple reports and depositions) on class certification issues, damages, and antitrust economics in regards to group licensing for former and current college football and basketball players in *O'Bannon et al. v. NCAA*.  2013-14.

Submitted three expert reports regarding lost earnings for a Major League Baseball player in *Backe et al. v. Fertitta Hospitality, LLC et al.*  2013.

Submitted two expert reports on class certification issues in regards to ticket holder lawsuit in *Phillips et al. v. Comcast Spectacor et al.*  2013.

Submitted expert report in a federal case involving defamation of character in the boxing industry (*Pacquiao v. Mayweather Jr. et al.*).  2012.

Provided deposition testimony and prepared expert report regarding an alleged sponsorship breach of contract in motorsports (*Vici Racing, LLC v. T-Mobile USA, Inc.*).  2012.

Prepared expert witness testimony on trade secrets case involving the sports consulting industry (*Sport Management Research Institute v. Keehn*).  2011.

Provided deposition testimony on the value of a minor league baseball team and related damages from an alleged breach of a facility lease permit (*Long Beach Armada v. City of Long Beach*). 2011.

Provided deposition testimony on the value of athlete endorsements in a breach of contract case involving an NBA player and a charter school business in an arbitration proceeding (*D Wade's Place v. Dwyane Wade*).  2010.

Provided deposition testimony on the value of athlete endorsements in a breach of contract case involving an NBA player and a restaurant investment in a state court proceeding (*Rodberg v. Dwyane Wade*).  2010.

Submitted two reports and provided deposition and arbitration testimony regarding damages related to how media coverage has impacted an NFL team's brand (*Kiffin v. Raiders*).  2009.

Submitted expert report, rebuttal report, gave deposition and trial testimony in federal court (*Adderley et al. v NFLPA and NFLPI*).  2008.

Public testimony on economic impact of a Major League Soccer stadium in San Jose to the San Jose City Council.  2008.

Public testimony on economic impact of six sports and cultural events in San Jose to the San Jose City Council.  2007.

Submitted expert report, rebuttal report, and testified at arbitration hearing on the financial valuation of Major League Soccer (*Rothenberg v. Major League Soccer, LLC*).  2006.

Named expert witness for a Major League Baseball club to analyze a punitive damages claim from an injury at a baseball game (*Bueno v. Rangers*).  2006.

Prepared expert testimony on liability and damages related to the operations of a minor baseball league on behalf of the league's owner (*Don Altman et al., v. Jeffrey Mallet, et al.*).  Case was settled prior to deposition.  2004.

Public testimony on economic impact of an existing and new professional football stadium in Irving, TX to the Irving City Council (two council meetings).  2004.

Testimony on college athletics regarding Senate Bill 193 to the California State Senate Subcommittee on Entertainment.  2003.

Public testimony on economic impact of a downtown entertainment district in Sacramento to the Sacramento City Council (two council meetings).  2003.

Determination of IP valuation and damages from a clothing endorsement alleged breach of contract for PGA Tour player (*Stankowski v. Bugle Boy*).  Submitted expert report.  Case was settled prior to deposition.  2000.

Deposition testimony in breach of contract matter concerning damages analysis in the auto racing industry (*Parente v. Della Penna Racing*).  2000.

Public testimony on forecast of economic impact of Pan Am Games on San Antonio to the San Antonio City Council.  1999.

Updated April 2016

Appendix B

Documents Relied Upon

(in order of listing)

"The Antitrust Implications of "Paperless Ticketing" on Secondary Markets," Daniel A. Rascher and Andrew D. Schwarz.  In *Journal of Competition Law and Economics*, Vol. 9, No. 3, 2013.

"An Examination of Underlying Consumer Demand and Sport Pricing Using Secondary Market Data," Daniel A. Rascher, Joris Drayer and Chad McEvoy.  In *Sport Management Review*, Vol. 15, No. 4, November 2012.

"Variable Ticket Pricing in Major League Baseball" Daniel A. Rascher, Chad McEvoy, Mark Nagel, and Matthew Brown.  In *Journal of Sport Management*, Vol. 21, No. 3, July 2007.

"The Use of Public Funds for Private Benefit: An Examination of the Relationship between Public Stadium Funding and Ticket Prices in the National Football League" Daniel A. Rascher, Matthew Brown and Wesley Ward.  In *International Journal of Sport Finance*, Vol. 1, No. 2, June 2006.

"Pricing the Game Experience," Daniel A. Rascher, Stephen Shapiro and Tim DeSchriver. Invited research presentation at *Sport Entertainment & Venues Tomorrow* conference, 2013, University of South Carolina.

"The Demand for College Football Bowl Games," Daniel A. Rascher and Terence Eddy.  In *International Journal of Sport Finance*, Vol. 11, No. 2, February 2016.

"The Impact on Demand from Winning in College Football and Basketball: Are College Athletes More Valuable than Professional Athletes?" Daniel A. Rascher and Chad McEvoy.  In *Selected Proceedings of the Santa Clara University Sports Law Symposium*, September 2012.

"If We Build It, Will They Come?: Examining the Effect of Expansion Teams and Soccer-Specific Stadiums on Major League Soccer Attendance," Daniel A. Rascher, Steve Shapiro and Tim DeSchriver.  In *Sport, Business, and Management: An International Journal*, Vol. 6, No. 2, Spring 2016.

"An Analysis of Expansion and Relocation Sites for Major League Soccer" Daniel A. Rascher, Matthew Baehr, Jason Wolfe, and Steven Frohwerk.  In *International Journal of Sport Management*, Vol. 7, No. 1, January 2006.

"Where did National Hockey League Fans go During the 2004-2005 Lockout?: An Analysis of Economic Competition Between Leagues," Daniel A. Rascher, Matthew Brown, Mark Nagel, and Chad McEvoy.  In *International Journal of Sport Management and Marketing*, Vol. 5, Nos. 1, 2, January 2009.

"The Effects of Roster Turnover on Demand in the National Basketball Association," Daniel A. Rascher, Steve Shapiro, Alan Morse, and Chad McEvoy.  In *International Journal of Sport Finance*, Vol. 3, No. 1, February 2008.

"Do Fans Want Close Contests?: A Test of the Uncertainty of Outcome Hypothesis in the National Basketball Association" Daniel A. Rascher and John Paul Solmes.  In *International Journal of Sport Finance*, Vol. 3, No. 2, August 2007.

"NBA Expansion and Relocation: A Viability Study of Various Cities" Daniel A. Rascher and Heather Rascher.  In *Journal of Sport Management*, Vol. 18, No. 3, July 2004.

"Does Bat Day Make Cents?: The Effect of Promotions on the Demand for Baseball," Daniel A. Rascher and Mark McDonald.  In *Journal of Sport Management*, Vol. 14, No. 1, January 2000.

"A Test of the Optimal Positive Production Network Externality in Major League Baseball," Daniel A. Rascher in E. Gustafson and L. Hadley, eds., *Sports Economics: Current Research*, 1999.  Praeger Press.

Mankiw, G. N. (2015). Principles of Economics, 7th edition. Stamford, CT: Cengage Learning.

Happel, S. K., and Marianne, M. J. (1995).  The folly of anti-scalping laws. *Cato Journal, 15*(1), pp. 65-80; Spindler, Z. A. (2003).

How "parasites" serve their host: a graphical analysis of "scalping". *Public Finance Review, 31*(6), pp. 694-699; Courty, P. and Pagliero, M. (2009).

Price discrimination in the concert industry. *Centre for Economic Policy Research*, Discussion Paper No. 7143.

Leslie, P. and Sorensen, A. (2009).  The welfare effects of ticket resale.  *National Bureau of Economic Research*, Working Paper No. 15476.

Krueger, A. B. and Pray, M. C. (2008).  Evidence on the secondary market for concert tickets. *Research Gate*, Publication No. 22886279.

Depken, C. A. (2006).  The impact of new stadiums on professional baseball team finances. *Public Finance and Management, 6*(3).

Karp, L. and Perloff, J. M. (2005).  When promoters like scalpers.  *Journal of Economics & Management Strategy, 41*(2).

Swofford, J. L. (1995).  Arbitrage, speculation, and public policy toward ticket scalping.  *Public Finance Review, 27*(5).

Geng, X., Wu, R., and Whinston, A. B. (2007).  Profiting from partial allowance of ticket resale. *Journal of Marketing, 71*(2).

Sweeting, A. (2012).  Dynamic pricing behavior in perishable goods markets: evidence from secondary markets for Major League Baseball tickets.  *Journal of Political Economy, 120*(6).

Krueger, A. B. (2001). Supply and demand: an economist goes to the Super Bowl. *The Milken Institute Review, 2001*(2).

Drayer, J. (2011). Making a case for the integration of the primary and secondary ticket markets for professional team sports in the United States. *International Journal of Sports Marketing & Sponsorship, 12*(3).

Geng, X., Wu, R., and Whinston, A.B. (2006). Profiting from partial allowance of ticket resale. *International Industrial Organization Conference, 2006*, Paper ID 523 at editorialexpress.com.

*Complaint and Jury Demand* - (*Steven Glickman and Andrew Kimmel v. Live Nation Entertainment, Inc. et al.*).

Waldman, D.E., and Jensen, E.J. (1998).  *Industrial Organization: Theory and Practice*. Addison-Wesley.

Elfenbein, D.W. (2006). Do anti-ticket scalping laws make a difference online? Evidence from internet sales of NFL tickets. *Social Science Research Network*, Abstract ID 595682.

Office of New York State Attorney General Eric T. Schneiderman (2016), "Obstructed View: What's blocking New Yorkers from getting tickets," at on.ny.gov/20vdr9p.

Tom Ley (2015), "How players manage to scalp their Super Bowl tickets," Deadspin, Feb. 10, at bit.ly/1RJ5kza.

ESPN (2005), "Tice expects 'big fine' for actions," ESPN, Mar. 10, at es.pn/1ROnqWI.

Horizontal Merger Guidelines of the U.S. Department of Justice and the Federal Trade Commission (http://1.usa.gov/21jA9Tt).

Europe Economics. (2009). Analysis of the secondary sales market for tickets for sporting, cultural and other events. Published Sep. 14, 2009, p. 24, at bit.ly/1MrSOCc.